# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| Global Safety Textiles Holdings LLC, <u>et al.</u>,[1] | ) | Case No. 09-12234 (KG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Objection Deadline:  September 8, 2009 @ 4:00 p.m.** |
| | ) | **Hearing Date:  September 14, 2009 @ 2:00 p.m.** |

## MOTION FOR FINAL ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION SECURED FINANCING; (II) MODIFYING THE AUTOMATIC STAY; AND (III) AMENDING THE PRIOR CASH COLLATERAL ORDER

The above-captioned debtors and debtors in possession (collectively the "Debtors") file this motion (the "Motion") for entry of a final order (substantially in the form attached hereto as <u>Exhibit 1</u>, the "DIP Order") pursuant to sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101, <u>et seq.</u> (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules (the "Local Rules") of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Court"):  (i) authorizing Global Safety Textiles Holdings LLC ("Safety Holdings" or the "Borrower") to obtain secured debtor-in-possession financing on a super-priority basis (and approving agreements relating thereto and allowing the Debtor Parties (defined below) to pay certain fees and expenses in connection therewith), (ii) modifying the

---

[1]    The Debtors are comprised of the following nine entities (with the last four digits of their respective taxpayer identification numbers, if any, in parentheses):  Global Safety Textiles Holdings LLC (1938), GST ASCI Holdings Asia Pacific LLC (7107), GST ASCI Holdings Europe, Inc. (7081), GST ASCI Holdings Europe II LLC (7081), GST ASCI Holdings Mexico, Inc. (7083), GST Automotive Safety Components International, Inc. (1750), Global Safety Textiles LLC (3442), Global Safety Textiles Acquisition GmbH and GST Widefabric International GmbH.  The address for each of the Debtors is 804 Green Valley Road, Suite 300, Greensboro, North Carolina 27408.

automatic stay to the extent necessary to implement the debtor-in-possession financing arrangement; and (iii) amending the prior cash collateral order, and respectfully represent as follows:

## Preliminary Statement

The Debtors, headquartered in Greensboro, North Carolina, comprise one of the leading Tier 2 manufacturers and distributors of one-piece woven airbags, airbag cushions and flat fabric for airbags, focusing primarily on the automotive industry. The Debtors operate manufacturing and warehouse facilities in South Hill, Virginia; Cordova, North Carolina; and Otay, California. Outside of the United States, through their non-debtor wholly-owned operating subsidiaries, the Debtors indirectly operate manufacturing facilities in Mexico, Germany, the Czech Republic, Romania and Poland.

The Debtors had approximately $4.0 million in cash on hand as of the date they commenced the chapter 11 cases (the "Petition Date"). All of such cash is subject to encumbrances asserted by the Debtors' prepetition secured lenders, all as more fully set forth in the Debtors' motion filed on the Petition Date seeking, among other things, authority to use cash collateral [Docket No. 14].[2] Although the Court authorized the Debtors' use of cash collateral on an interim basis [Docket No. 43] on July 2, 2009, and on a final basis [Docket No. 138] on July 30, 2009 (the "Cash Collateral Order"), the Debtors have determined that the certainty of additional liquidity that can only be provided by debtor-in-possession financing is necessary for the preservation and maximization of their estates as a whole, particularly as the Debtors take the steps necessary to exit expeditiously from chapter 11 over the course of the following two months.

The Debtors have a need to obtain debtor-in-possession financing in order to, among other things, permit the orderly continuation of their businesses, preserve the going concern value of the Debtors, make payroll and satisfy other working capital and general corporate purposes of the Debtors pending their exit from chapter 11. The debtor-in-possession financing is necessary to ensure that the Debtors have sufficient working capital and liquidity to preserve and maintain the going concern value of the Debtors' estates and to emerge from chapter 11.

The Debtors and their non-debtor wholly-owned subsidiaries are borrowers and/or guarantors under that certain Term and Revolving Facility Agreement, dated December 8, 2006, as amended April 1, 2007, June 11, 2007, November 16, 2007, and amended and restated on April 15, 2008 (the "Prepetition Credit Agreement" and the credit facility available thereunder, the "Prepetition Credit Facility"). At the request of the Debtors, certain of the Debtors' lenders (together with such additional lenders that may be party thereto from time to time, the "DIP Lenders") under the Prepetition Credit Facility offered to provide the Debtors up to an aggregate of $5 million principal amount of postpetition debtor-in-possession financing (the "DIP Facility" or the "DIP Financing"). On or about July 21, 2009, the DIP Lenders executed that certain Global Safety Textiles Holdings LLC and Global Safety Textiles Acquisition GmbH Debtor-In-Possession Facility Commitment Letter (attached hereto as <u>Exhibit 2</u>, the "Commitment Letter"). Under the Commitment Letter, the DIP Lenders committed to provide the DIP Facility on the terms and conditions set forth in the Commitment Letter and in an annex thereto (the "DIP Term Sheet").

---

[2]      In addition, as of the Petition Date, European non-debtor Global Safety Textiles GmbH and its European affiliates had approximately $23.9 million of cash on hand, which is also subject to a lien in favor of the Debtors' prepetition secured lenders.

Certain of the Debtors accepted the Commitment Letter on or about July 28, 2009, and the Commitment Letter and the DIP Term Sheet are attached as exhibits to that certain Restructuring and Plan Support Agreement (the "PSA") executed by certain of the Prepetition Lenders on or about July 21, 2009 (the "Supporting Lenders") and certain of the Debtors on or about July 28, 2009.  The DIP Financing, which is being provided by a subset of the Supporting Lenders and certain of their affiliates, is a necessary bridge to the Debtors' emergence from chapter 11 pursuant to a plan of reorganization agreed to by the Debtors and the Supporting Lenders, which provides generally for the priority Prepetition Lenders' (the "Priority Lenders") receipt of 100% of the equity interests of the reorganized Debtors, $70 to $75 million of first lien secured debt and $30 million of second lien secured debt.  It is anticipated that the DIP Financing will roll-over into the proposed exit financing as $5 million of the $75 million of first lien secured debt pursuant to the terms of that plan of reorganization.

The Debtors have been negotiating the terms and conditions of the DIP Financing with the DIP Lenders and anticipate filing before the hearing on the Motion definitive documentation in connection with the DIP Financing including the Senior Secured Priming and Superpriority Debtor-in-Possession Credit Agreement (as thereafter amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof and which shall be attached at the time of entry to the DIP Order as <u>Exhibit A</u>, the "DIP Agreement";[3]  and together with all agreements, documents and instruments delivered or executed in connection herewith or therewith, including, without limitation, a budget (a copy of which shall be attached at the time of entry to the DIP Order as <u>Exhibit B</u> (a "Budget"), in each case as hereafter

---

[3]    Unless otherwise stated, capitalized terms not defined herein shall have the meaning ascribed to them in the DIP Agreement or the Cash Collateral Order.

amended, supplemented or otherwise modified from time to time in accordance with the terms

hereof and thereof, the "DIP Documents").[4]

In accordance with Bankruptcy Rule 4001, the following sets forth a concise

summary[5] of some of the material terms of the DIP Facility and the DIP Commitments (as

defined below):

| Borrower: | Safety Holdings. (DIP Order, at 2). |
|---|---|
| Guarantors: | The U.S. Debtors in these chapter 11 cases (the "Guarantors" and together with the Borrower, the "Debtor Parties"). (DIP Order, at 2). |
| Lenders: | Certain of the Prepetition Lenders (or their affiliates) and certain other financial institutions from time to time parties to the DIP Agreement. (DIP Order, at 2). |
| Administrative Agent and Collateral Agent: | Nexbank, SSB, as administrative agent and collateral agent for itself and the DIP Lenders (in such capacity, the "DIP Agent"). (DIP Order, at 2). |
| Credit Type and Amount: | Loans under a senior secured superpriority debtor-in-possession term loan facility (the "DIP Loans") in an aggregate principal amount of $5 million, which DIP Loans shall be funded into a collateral account subject to a lien in favor of the DIP Agent for the benefit of the DIP Lenders, with drawings by the Borrower from the collateral account to be subject to the "Borrowing Base" described below and the Budget. (DIP Order, at 1, ¶¶ 5(a), 6(a)). |
| Maturity Date / Termination Date: | It is anticipated that the "Termination Date" will be the earliest to occur of: (a) [October 31, 2009], (b) the date on which the aggregate commitments of the DIP Lenders (together the "DIP Commitments" and for each DIP Lender, a "DIP Commitment") shall terminate in accordance with the provisions of the DIP Agreement, (c) the "Effective Date" of the Plan (defined below), |

---

[4]    The Debtors and DIP Lenders expressly reserve their rights to modify the proposed DIP Agreement, the DIP Order and any of the DIP Documents prior to the hearing on the Motion.

[5]    This summary is subject in all respects to the negotiation, execution and delivery of mutually acceptable definitive documentation (the "Definitive Documentation"). The terms of the Definitive Documentation to be agreed upon and executed are not limited by this summary, and terms set forth herein may be modified in the Definitive Documentation to be agreed upon by the parties. This Motion does not, in any respect, bind or obligate the DIP Agent or any DIP Lender, and nothing contained herein shall constitute the DIP Agent's or any DIP Lender's agreement to extend credit, or an offer to or agreement to engage in transactions of any kind. Any summary of the DIP Facility or the DIP Order contained in the Motion is intended only to assist the Court in understanding key aspects of such order and DIP Facility and is qualified in its entirety by reference to the DIP Agreement and the DIP Order. To the extent of any inconsistency between this Motion on the one hand and the DIP Order and the DIP Agreement on the other hand, the DIP Order and the DIP Agreement control.

| | |
|---|---|
| | (d) the date of the closing of a sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code and (e) the date that the chapter 11 cases are converted into cases under chapter 7 of the Bankruptcy Code or dismissed. |
| Roll-Over of DIP Lender Commitments: | It is anticipated that upon the Effective Date of the Plan on the terms set forth in the PSA or as are otherwise agreed by the DIP Lenders, the DIP Agent, the Prepetition Agent, the Security Agent and the Priority Lenders, (i) the full amount of any outstanding loans and unfunded DIP Commitments shall automatically be converted into loans and unfunded commitments, as applicable, under the first lien exit financing facility (the "First Lien Facility") outlined in the PSA or (ii) the full amount of all amounts due under the DIP Facility shall be paid in full in cash from the proceeds of any exit financing facility. |
| Closing Date: | It is anticipated that unless the Debtors and the DIP Lenders agree to a later date in writing, the DIP Facility shall be approved by a final order of the Court and consummated no later than September 15, 2009. |
| Availability for Draw: | The DIP Agreement will provide that funds are to be released from the collateral account upon satisfaction or waiver of customary conditions precedent in an aggregate amount not to exceed at any time outstanding the least of: (i) $5,000,000, (ii) the applicable amount set forth in the Budget and (iii) the Borrowing Base (as defined below), but including a reserve for the carve-out amount of $200,000 for payment of professional fees, fees for the United States Trustee for the District of Delaware (the "U.S. Trustee") and other similar administrative costs. |
| Security/Priority: | As set forth in greater detail in and subject to the limitations contained in the DIP Order, the DIP Agent for the benefit of the DIP Lenders will be granted pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, valid, binding, enforceable, unavoidable and fully perfected first priority, senior priming security interests and liens (collectively, the "DIP Liens") in and upon all of the Prepetition Collateral and all other prepetition and postpetition real and personal, tangible and intangible property and assets of each Debtor Party. Notwithstanding anything in the Cash Collateral Order to the contrary, the DIP Liens: (a) shall, pursuant to section 364(c)(2) of the Bankruptcy Code, constitute first priority security interests in and liens on all DIP Collateral that is not otherwise subject to any lien or security interest that (i) is permitted under the DIP Documents, (ii) was perfected prior to the Petition Date (or perfected on or after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code), (iii) is not subject to avoidance, disallowance, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law and (iv) is |

| | senior in priority to the liens of the Prepetition Agent, the Security Agent, and the Priority Prepetition Lenders under applicable law and after giving effect to any lien release, subordination or inter-creditor agreements (such senior liens and security interests, the "Prior Liens"); (b) shall, pursuant to section 364(d)(1) of the Bankruptcy Code, be senior to and prime (i) the liens of the Prepetition Agent, the Security Agent and the Prepetition Lenders, and (ii) the Adequate Protection Liens (the liens described in clauses (i) and (ii) above, collectively, the "Primed Liens"); and (c) shall, pursuant to section 364(c)(3) of the Bankruptcy Code, be immediately junior in priority to any and all Prior Liens (other than the Primed Liens) on or in the DIP Collateral, but the DIP Liens shall be subject to the Carve-Out.[6]  Additionally, notwithstanding anything to the contrary in the Cash Collateral Order, in addition to the DIP Liens, pursuant to the DIP Order, the DIP Agent and DIP Lenders will be granted, for all DIP Obligations, an allowed super-priority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code (the "Super-Priority Claims") against each Debtor Party and its respective estate.  Except for the Carve-Out, notwithstanding anything to the contrary in the Cash Collateral Order, under the DIP Order, the Super-Priority Claims shall have priority over all other costs and expenses of administration of any kind (and no cost or expense of administration shall be senior to, equal to, or pari passu with, the Super-Priority Claims), including those specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 363, 364, 503, 507, 546, 726, 1113 or 1114 or any other provision of the Bankruptcy Code.  (DIP Order ¶¶ 7-8). |
|---|---|
| Adequate Protection: | The Debtors will continue to provide the adequate protection provided for by the Cash Collateral Order. |
| Use of Proceeds / Budget: | To be used consistent with and subject to the limitations of the Budget to fund postpetition operating expenses and other general corporate needs, including working capital needs and to pay certain administrative expenses of the chapter 11 cases, including |

---

[6]     As set forth more fully in the DIP Order, the "Carve-Out" includes:

>  (i) the unpaid fees due and payable to the Clerk of the Bankruptcy Court and of the Office of the United States Trustee under 28 U.S.C. § 1930(a) and (ii) after the occurrence and during the continuance of an Event of Default under the DIP Agreement, the payment of allowed and unpaid professional fees and disbursements (except any such fees and disbursements incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Agent, the DIP Lenders, the Prepetition Agent, the Security Agent or the Prepetition Lenders) incurred after the occurrence of an Event of Default by the Debtors and the Creditors' Committee . . . in an aggregate amount not in excess of $200,000 . . . ."

See DIP Order ¶ 12(a).

| | |
|---|---|
| | reasonable fees and expenses of certain professionals. (See DIP Order ¶¶ 5(a), 6(a)). |
| Interest: | It is anticipated that interest will be payable at a rate equal to (a) LIBOR, subject to a LIBOR floor of 3% per annum, or (b) the "Base Rate" (defined as the highest of: (i) the "Prime Rate," (ii) the sum of 3% per annum and the "Federal Funds Rate," and (iii) the sum of LIBOR plus 1% per annum), as the case may be, plus 9% per annum in the case of a "Base Rate Loan" and 10% per annum in the case of a "LIBOR Rate Loan" (the "Applicable Interest Rate"). Automatically upon the occurrence and during the continuance of an event of default under the DIP Facility (each, an "Event of Default"), interest on all amounts then outstanding will accrue at a rate equal to the Applicable Interest Rate then in effect, plus an additional 2% per annum, payable on demand. (See DIP Order ¶ 5(d)). |
| Initial Fee:[7] | A fee of 3% of the DIP Facility, payable to the DIP Agent, for the benefit of the DIP Lenders, to be paid upon the entry of the DIP Order. (See DIP Order ¶ 5(d)). |
| DIP Agent Fee: | Fees to the DIP Agent, for the DIP Agent's own account, in the amounts and at times set forth in a separate fee letter to be signed by Borrower and the DIP Agent when the DIP Agreement is signed. (See DIP Order ¶ 5(d)). |
| Exit Fee: | A non-recurring fee of 3% of the DIP Facility, payable to the DIP Agent, for the benefit of the DIP Lenders, to be paid upon the Termination Date in the event that the DIP Facility is not converted into the First Lien Facility under the Plan. (See DIP Order ¶ 5(d)). |
| Roll-Over Fee: | A non-recurring fee of 6% of the DIP Facility, payable to the DIP Agent, for the benefit of the DIP Lenders, to be paid upon the Effective Date in the event that the DIP Facility is converted into the First Lien Facility. (See DIP Order ¶ 5(d)). |
| Alternative Transaction Fee: | 2% of the DIP Commitments (the "Alternative Transaction Fee") to be paid upon the Debtors' consummation of any transaction involving the recapitalization of the Debtors' businesses through a stand-alone plan of reorganization or sale of substantially all of the Debtors' assets, financed in whole or in part, by a party or parties other than the Prepetition Lenders at any time during the term of the Commitment Letter or within six (6) months after its termination. The Alternative Transaction Fee is part of the consideration for the DIP Commitments. (DIP Order ¶¶ 5(a), 5(d), 25; Commitment Letter, at 2). |
| Borrowing Base: | It is anticipated that the "Borrowing Base", which may be less certain reserves that the DIP Agent may establish, will be calculated as follows: (i) 50% of the book value of certain eligible |

---

[7]    All fees payable to the DIP Agent for the benefit of the DIP Lenders shall be fully earned on the date such payment is due and shall be non-refundable.

| | |
|---|---|
| | accounts receivable; (ii) 10% of the Net Orderly Liquidation Value (as defined in the DIP Agreement) of certain eligible equipment; and (iii) 25% of the book value of certain eligible inventory valued at the lower of cost or market on a first-in, first-out basis. |
| Events of Default: | As will be set forth in greater detail in the DIP Agreement, it is anticipated that Events of Default will include but not be limited to (i) nonpayment of amounts payable under the DIP Documents including failure to reimburse the DIP Agent or DIP Lenders for expenses; (ii) representations or warranties being untrue or incorrect; (iii) breaches and/or violations of certain terms of or covenants in the DIP Agreement; (iv) the filing of any Insolvency Proceeding (as defined in the DIP Agreement) by or against any direct or indirect foreign subsidiaries of any Debtor Party, which are not dismissed; (v) certain defaults under other financing arrangements; (vi) a Change of Control (as defined in the DIP Agreement) having occurred; (vii) certain business interruptions occurring and continuing for more than thirty (30) days; and (vii) the occurrence of any of the following in the Debtors' chapter 11 cases: (a) seeking or obtaining additional financing, the granting of additional liens, and/or the use of cash collateral without the prior written consent of the DIP Agent or taking other actions adverse to the DIP Agent and DIP Lenders or their rights and remedies under the DIP Agreement or their interest in collateral; (b) filing or confirmation of a plan of reorganization to which the DIP Agent does not consent and which does not provide for payment in full in cash of the DIP Obligations on or before the effective date of such plan; (c) entry of an order amending, supplementing, staying, vacating or otherwise modifying the DIP Documents, the Cash Collateral Order or the DIP Order without the written consent of the requisite DIP Lenders; (d) payment of certain prepetition claims; (e) entry of an order imposing a surcharge against the DIP Agent or any DIP Lender or their collateral; (f) appointment of a trustee or receiver in the chapter 11 cases; (g) certain non-consensual asset sales; (h) the chapter 11 cases being converted to cases under chapter 7 or dismissed; (i) entry of certain orders granting relief from the automatic stay; (j) commencement of certain suits or actions against the DIP Agent or any DIP Lender that are not dismissed within thirty (30) days; (k) entry of an order avoiding or requiring repayment of payments made on account of DIP Obligations; (l) breach or failure to perform under the DIP Order or Cash Collateral Order; and (m) entry of an order granting liens equal to or senior to those granted to the DIP Agent. |

MIAMI 829268 (2K)

| | |
|---|---|
| Remedies: | As more fully set forth in the DIP Agreement and the DIP Order, it is anticipated that upon the occurrence and during the continuance of any Event of Default, the DIP Agent may, and shall at the request of the requisite DIP Lenders, without further notice, motion or application to, order of, or hearing before the Court: (a) declare all or any portion of the DIP Commitments to be suspended or terminated; (b) accelerate the DIP Loans; (c) increase the Applicable Interest Rate to the default rate; (d) revoke the Debtor Parties' right, if any, to use the DIP Collateral and proceeds of the DIP Collateral and/or DIP Facility; and after obtaining relief from the Court from the automatic stay upon hearing and seven (7) business days' prior notice to respective counsel to the Debtors, the official committee of unsecured creditors (the "Creditors' Committee") and the U.S. Trustee, the DIP Agent and DIP Lenders may foreclose or otherwise enforce their security interests in and liens on any or all of the DIP Collateral and/or exercise any other default-related remedies against the DIP Collateral under the DIP Documents, the DIP Order or applicable law in seeking to recover payment of the DIP Obligations. |
| Conditions Precedent To All Borrowing and Drawings from the Collateral Account: | They are expected to include but not be limited to (i) preparation, execution and delivery of definitive documentation for and related to the DIP Facility reasonably acceptable to the DIP Agent; (ii) accuracy of representations and warranties; (iii) the DIP Order having been entered and not vacated, reversed, modified, amended or stayed without the written consent of the requisite DIP Lenders; (iv) the Debtor Parties having paid the fees required under the DIP Agreement; (v) the absence of defaults; (vi) the receipt of certain governmental approvals; and (vii) the delivery of a business plan, certain reports relating to the restructuring and certain other documents. Conditions precedent to drawings from the collateral account will include a maximum cash balance (anti-hoarding) requirement, availability under the Borrowing Base and compliance with the Budget. |
| Indemnification and Expense Reimbursement: | It is anticipated that the Debtor Parties will be required to indemnify, hold harmless and defend the DIP Agent, the DIP Lenders and certain other parties for certain liabilities in connection with the DIP Documents (including the Commitment Letter) but not to the extent that such liabilities resulted primarily from the gross negligence or willful misconduct on the part of the party that would otherwise be indemnified, as determined by a final, non-appealable judgment of a court of competent jurisdiction. Additionally, the Debtor Parties will be required to reimburse the DIP Agent for all out-of-pocket costs and expenses incurred in connection with the preparation of the DIP Documents (collectively, the "Expenses"). (See DIP Order ¶ 5(d)). |

## Disclosures Pursuant to Local Rule 4001-2

Local Rule 4001-2 requires that certain provisions of the DIP Facility be highlighted and that the Debtors provide justification for the inclusion of such highlighted provisions. Set forth below are the provisions of the DIP Facility that are required to be identified in accordance with Local Rule 4001-2. The Debtors respectfully submit that the facts and circumstances of these chapter 11 cases demonstrate that the provisions described below as to which disclosure is required pursuant to Local Rule 4001-2 are justified, necessary and appropriate and should be authorized and approved by this Court.

**Priming Liens**. Local Rule 4001-2(a)(i)(G) requires disclosure if the proposed financing provides for the non-consensual priming of any secured creditor's lien. Certain liens of the Prepetition Lenders are primed by the DIP Liens, see DIP Order ¶ 7, but it is anticipated that the Prepetition Agent, Security Agent and Prepetition Lenders will not object to such priming on the terms proposed in the DIP Agreement and DIP Order. See DIP Order ¶ 16. In addition, the Debtors submit that the Prepetition Lenders are adequately protected pursuant to the Cash Collateral Order.

**Liens on Chapter 5 Causes of Action**. Local Rule 4001-2(a)(i)(D) requires disclosure if liens on the debtor's claims and causes of action under sections 544, 545, 547, 548, and 549 of the Bankruptcy Code are granted to a prepetition secured creditor. The DIP Order does provide for perfected first priority senior priming liens on any avoidance actions under chapter 5 of the Bankruptcy Code (the "Avoidance Actions") and any proceeds thereof upon entry of an order approving the Motion. See DIP Order ¶ 7(a). However, the DIP Order also provides that "the DIP Agent and DIP Lenders shall not seek recourse to the Avoidance Action proceeds until such time as substantially all other assets constituting DIP Collateral have been

applied to the DIP Obligations and the DIP Obligations thereafter remain unsatisfied." See DIP Order ¶ 7(a).

## Other Local Rules Not Implicated by DIP Facility

No separate disclosure or discussion is required with respect to subsections (A)-(C) and (E)-(F) of Local Rule 4001-2(a)(i), as there are no provisions in the DIP Facility that are implicated by the requirements therein. See Local Rule 4001-2(a)(i)(A) (requiring disclosure if cross-collateralization protection is granted to prepetition secured creditors; none is granted here); Local Rule 4001(2)(a)(i)(B) (requiring disclosure of any financial provisions that bind the estate with regard to the validity, perfection, or amount of a secured creditor's prepetition lien or waive claims against a secured creditor without allowing interested parties at least 75 days from entry of the order, and the creditors' committee at least 60 days from formation, to investigate such matters; there are none here); Local Rule 4002(a)(i)(C) (requiring disclosure of provisions that constitute a waiver, without notice, of the estates' rights under section 506(c) of the Bankruptcy Code; although paragraph 10 of the DIP Order provides that "[e]xcept to the extent of the Carve-Out, no expenses of administration of the Cases or any Successor Case, shall be charged against or recovered from the DIP Collateral under section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent . . . [,]" the contemplated waiver is not being imposed without notice); Local Rule 4001-2(a)(i)(E) (requiring disclosure if the proposed financing deems prepetition secured debt to be postpetition debt or provides that postpetition loans from a prepetition secured creditor will be used to pay part or all of that secured creditor's prepetition debt, other than as provided in section 552(b) of the Bankruptcy Code; the proposed financing does not); and Local Rule 4001-2(a)(i)(F) (requiring disclosure if debtor's and creditors' committee professionals are given disparate

treatment with regard to a carve-out; they are treated the same under the Carve-Out).

**Jurisdiction and Venue**

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (D), (G), (K), (M) and (O).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Procedural Background**

2.      On June 30, 2009, each of the Debtors commenced a case under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      On July 2, 2009, the Court entered an order approving the joint administration of the Debtors' chapter 11 cases.

4.      On July 22, 2009, the U.S. Trustee appointed the Creditors' Committee in the Debtors' chapter 11 cases.

5.      No trustee or examiner has been requested or appointed in these chapter 11 cases.

6.      On or about July 21, 2009, the DIP Lenders executed the Commitment Letter and the Supporting Lenders executed the PSA, the terms of which were accepted by certain of the Debtors on or about July 28, 2009.

7.      On July 30, 2009, the Court entered the Cash Collateral Order.

8.      On August 12, 2009, the Debtors filed the Joint Chapter 11 Plan of Reorganization for Global Safety Textiles Holdings LLC and Its Affiliated Debtors (the "Plan") and the Disclosure Statement Relating to the Joint Chapter 11 Plan of Reorganization for Global Safety Textiles Holdings LLC and Its Affiliated Debtors.

## The Prepetition Credit Agreement

9.     Prior to the Petition Date, the Prepetition Lenders made loans and other financial accommodations to and for the benefit of the Debtors and their other subsidiaries pursuant to the Prepetition Credit Agreement.

10.     As of the Petition Date, pursuant to the Prepetition Credit Agreement, (i) the Debtors were indebted and liable to Goldman Sachs Credit Partners L.P. as security agent and administrative agent for the Priority Lenders (in such capacity, the "Priority Agent") and the Prepetition Lenders, without defense, counterclaim or offset of any kind, in respect of loans made by the Priority Agent and the Prepetition Lenders to the Debtors under the Prepetition Credit Agreement in the aggregate principal amount of not less than €116,797,146.90 (plus accrued and unpaid interest thereon) and $34,983,236.05 (plus accrued and unpaid interest thereon), (ii) the Debtors were indebted and liable to the Priority Agent and the Prepetition Lenders for fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees that are chargeable or reimbursable under the Prepetition Credit Agreement and related agreements, charges and other obligations incurred in connection with such loans and letters of credit as provided in the Prepetition Credit Agreement and certain other transaction documents, (iii) the Debtors were liable to certain of the Prepetition Lenders in respect of Hedging Agreements (as defined in the Prepetition Credit Agreement) to which any of the other Debtors was a party (items (i) through (iii), collectively, the "Prepetition Obligations") and (iv) each Debtor party to a guarantee executed and delivered in respect of the Prepetition Obligations was contingently liable to the Priority Agent and the Prepetition Lenders under each such guarantee in the aggregate amount of not less than the aggregate amount of the Prepetition

Obligations subject, in the case of the German Debtors, to the limitations set forth in clause 23.10 of the Prepetition Credit Agreement.

## Relief Requested

11. By this Motion, the Debtors respectfully request a final order pursuant to sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of the Bankruptcy Code:

a) granting authority for (a) the Borrower to obtain up to $5,000,000 in principal amount of postpetition financing on the terms and conditions set forth in the DIP Order (substantially in the form attached hereto as Exhibit 1) and the DIP Agreement (substantially in the form to be filed prior to the hearing on the DIP Motion and which shall be attached at the time of entry to the DIP Order as Exhibit A), and (b) each of the Guarantors to guaranty the Borrower's obligations in respect of the DIP Financing;

b) authorizing the Debtor Parties to (i) execute and deliver the DIP Agreement and the other DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith and (ii) comply in all respects with the DIP Agreement and the DIP Documents and pay all fees and expenses required in connection therewith;

c) approving the terms and conditions of the DIP Agreement and the DIP Documents;

d) modifying the automatic stay to the extent necessary to implement the DIP Facility;

e) authorizing amendment to the Cash Collateral Order; and

f) granting related relief.

## The Debtors' Need for Financing

12. Although the Debtors have obtained authority to use cash collateral, the Debtors believe that postpetition debtor-in-possession financing is necessary to augment their existing cash balances thereby ensuring a sufficient level of liquidity to fulfill their working capital and general corporate requirements during the remainder of these chapter 11 cases.

Because the Debtors' cash balance at any given time can be affected materially by delays in receipt of payments from customers or unforeseen disbursements, the Debtors believe the proposed DIP Financing is necessary to guaranty the continued liquidity necessary to permit the Debtors to pay their operating expenses, including the costs of administering these chapter 11 cases.

13. Regardless of whether cash collateral would or would not be sufficient to fund operations completely, however, vendors and suppliers may hesitate to continue to do business with the Debtors on customary terms if the Debtors do not have a postpetition credit line available. Moreover, approval of the DIP Facility is critical to the Debtors' ability to weather any unexpected challenges the Debtors may face during the chapter 11 process, including possible further dislocation in the credit markets and possible further deterioration in general economic conditions. Accordingly, the Debtors need to access the DIP Facility to continue their operations without impairment and complete the restructuring process.

14. Now that the Debtors have filed the Plan and emergence from chapter 11 is on the horizon, it is vital that the Debtors maintain and preserve the going concern value of their business, maintain customer and supplier confidence, and assure customers and suppliers that the Debtors' businesses will remain viable pending the Debtors' exit from chapter 11. The DIP Financing, to be a provided by a subset of the Prepetition Lenders, will enable the Debtors to preserve the going concern value of their estates and provide the Debtors the bridge they need to successfully emerge from chapter 11 in accordance with, and subject to the terms and conditions of the PSA, as implemented through the Plan.

15. If the Debtors are unable to obtain approval of the proposed DIP Facility, the recoveries to all creditors, including the Prepetition Lenders, may be reduced in the event that

the Debtors in fact have insufficient liquidity to maintain their businesses as a going concern and to emerge from chapter 11. Under a liquidation scenario, the value of the Debtors' estates would decline dramatically. Entry of the DIP Order is therefore (i) critical to the Debtors' ability to reorganize pursuant to the Bankruptcy Code, (ii) in the best interests of the Debtors and their estates and (iii) necessary to avoid irreparable harm. The Debtors therefore, respectfully request that the Court grant the Motion.

### Basis for Relief

**A.    The Debtors' Entry into the DIP Facility Is Authorized Under Section 364 of the Bankruptcy Code**

16.    Section 364 of the Bankruptcy Code provides bankruptcy courts with the power to authorize postpetition financing for chapter 11 debtors. See Kearns v. Vineyard Bay Dev. Co. (In re Vineyard Bay Dev. Co.), 132 F.3d 269, 272 (5th Cir. 1998); see also In re Pro Set, Inc., 193 B.R. 812, 814 (Bankr. N.D. Tex. 1996) (court's prior order authorized debtor to incur postpetition indebtedness under section 364); In re Defender Drug Stores, Inc., 126 B.R. 76, 81 (Bankr. D. Ariz. 1991) ("Having recognized the natural reluctance of lenders to extend credit to a company in bankruptcy, Congress designed [section] 364 to provide 'incentives to the creditor to extend post-petition credit.'"). The incentives enumerated in section 364 are not intended to be an exhaustive list of the inducements that a court may grant. Id. In fact, it is not uncommon for a court to approve a lending arrangement containing terms not specified in section 364. Id.

17.    Generally, courts apply a three-part test to determine whether credit obtained may be granted under section 364(c). The three-part test includes demonstrating that (1) the debtor cannot obtain credit unencumbered or without superpriority status, (2) the credit transaction is necessary to preserve the assets of the estates, and (3) the terms of the credit

agreement are fair, reasonable and adequate given the circumstances of the debtor-borrower and the proposed lender. See In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987), aff'd, 75 B.R. 553 (E.D. Pa. 1987).

18.     If a debtor is unable to obtain credit under the provisions of section 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a "priming" senior or equal lien on property of the estate that is already subject to a lien under section 364(d) of the Bankruptcy Code. Specifically, section 364(d)(1) of the Bankruptcy Code provides that a court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

(i)     the trustee is unable to obtain such credit otherwise; and

(ii)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d); see also In re 495 Central Park Ave. Corp., 136 B.R. 626, 631-32 (Bankr. S.D.N.Y. 1992) (allowing postpetition lenders' liens to prime existing security interests because (i) debtor was unable to obtain financing otherwise and (ii) debtor's use of proceeds would provide adequate protection to existing secured creditors by increasing value of property securing their claims). Consent by the secured creditors to priming obviates the need to show adequate protection. See Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected."). Accordingly, the Debtors may incur "priming" liens under the DIP Facility if they are unable to obtain unsecured or junior secured credit and either (i) the Prepetition Agent, Security Agent and Prepetition Lenders have not objected and are deemed to consent or (ii) the Prepetition Lenders' interests in collateral are adequately protected.

19.     Against this statutory backdrop, courts will evaluate the facts and circumstances of a debtor's case and accord significant weight to the necessity for obtaining the financing.  See In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).  Debtors in possession are generally permitted to exercise their basic business judgment consistent with their fiduciary duties when evaluating the necessity of proposed protections for a party extending credit under section 364 of the Bankruptcy Code.  Id. at 38.

20.     As set forth below, unsecured credit and non-priming lien financing was simply not available to the Debtors, the Prepetition Lenders are provided ample adequate protection of their interests in the prepetition collateral, and the Prepetition Agent, Security Agent and Prepetition Lenders will not object to the priming liens in the proposed DIP Facility.

**1.     The Debtors Are Unable to Obtain Unsecured or Junior Secured Credit**

21.     A debtor need only demonstrate that, notwithstanding its good faith efforts, credit was unavailable without the protections afforded to potential lenders by sections 364(c) and (d) of the Bankruptcy Code.  See Bray v. Shenandoah Fed. Sav. & Loan Ass'n. (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986) (affirming district court's grant of a priming lien, where "the trustee had demonstrated by a good faith effort that credit was not available without the senior lien."); In re 495 Central Park Ave. Corp., 136 B.R. at 630-31 (noting that, although "the debtor must make an effort to obtain credit without priming a senior lien," it does not need "to seek alternate financing from every possible lender.").

22.     As discussed above, the Debtors' assets are subject to the prepetition liens of the Prepetition Lenders.  Because of the substantial amount of prepetition debt, obtaining the financing needed by the Debtors as unsecured debt on an administrative priority basis, or as debt which would be secured solely by liens junior to the liens of the Prepetition Lenders, was not a

viable option, especially from a third party who did not already have a financial interest in the

Debtors to protect. Moreover, in the absence of the Prepetition Agent's, Security Agent's and

Prepetition Lenders' consent to the granting of senior or pari passu liens to a new third party

debtor-in-possession lender, costly and distracting litigation over the propriety of such third party

DIP financing would likely ensue, with potentially severe consequences for the Debtors and their

estates. Here, the Debtors anticipate that the Prepetition Agent, Security Agent and certain of the

Prepetition Lenders will not object to the priming of their liens, but only on the terms set forth in

the DIP Agreement and DIP Order.

23. In short, the Debtors concluded that adequate alternative financing terms

more favorable than those to be provided by the DIP Lenders under the DIP Facility are currently

unobtainable under the circumstances of the chapter 11 cases. Accordingly, the Debtors have

satisfied the requirements of section 364(c) and (d) of the Bankruptcy Code that alternative credit

on more favorable terms was unavailable to the Debtors.

   **2.  Although it Is Anticipated that the Prepetition Agent, Security Agent and
        Certain of the Prepetition Lenders Will Not Object to the Priming of Their
        Liens Subject to the Terms of the DIP Agreement and the DIP Order,
        Adequate Protection Is Nevertheless Being Provided Pursuant to the Cash
        Collateral Order and the Proposed Use of the DIP Financing**

24. If a debtor is unable to obtain credit under the provisions of section 364(c)

of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on

property of the estate that is already subject to a lien (i.e., a priming lien). See 11 U.S.C.

§ 364(d). Such relief may be granted over the objection of a secured creditor whose lien will be

primed so long as there is adequate protection of the secured creditor's interests on the property

on which the senior lien is supposed to be granted. See id.; see also In re Aqua Assocs., 123

B.R. 192, 196 (Bankr. E.D. Pa. 1991).

25. What constitutes sufficient adequate protection, whether for a priming lien under section 364(d) or for the use of cash collateral under section 363, is fact-specific and is determined on a case-by-case basis. See In re Mosello, 195 B.R. 277, 288-89 (Bankr. S.D.N.Y. 1996). "Its application is left to the vagaries of each case." Id. at 289 (quoting In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)). Although the Bankruptcy Code does not explicitly define "adequate protection," section 361 of the Bankruptcy Code provides that it may take the form of (1) a cash payment or periodic cash payments to the extent that there is a decrease in the lien holder's property interest; (2) an additional or replacement lien to the extent that there is a decrease in the lien holder's property interest; or (3) other relief that will result in a secured party's realizing the indubitable equivalent of its property interest. See 11 U.S.C. § 361. Bankruptcy courts have broad flexibility under section 361 in deciding what constitutes adequate protection:

> This section specifies the means by which adequate protection may be provided. It does not require the court to provide it. To do so would place the court in an administrative role. Instead, the trustee or debtor in possession will provide or propose a protection method. If the party that is affected by the proposed action objects, the court will determine whether the protection provided is adequate. The purpose of this section is to illustrate means by which it may be provided and to define the contours of the concept.

H.R. Rep. No. 95-595, at 338, 95th Cong., 1st Sess. (1977); see also Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.), 16 F.3d 552, 564 (3d Cir. 1994) (Although section 361 provides examples of adequate protection, it allows "courts discretion in fashioning the protection provided to a secured party. Therefore, a determination of whether there is adequate protection is made on a case by case basis.") (citation omitted); In re 495 Central Park Ave. Corp., 136 B.R. at 631 ("The statute confers upon 'the parties and the courts flexibility by allowing such other relief as will result in the realization by the protected

entity of the value of its interest in the property involved.'") (quoting H.R. Rep. No. 95-595, at 340).

26.     Nevertheless, the "Court is not obligated to protect the creditor better than it did itself when making the loan and obtaining security." In re Heatron, Inc., 6 B.R. 493, 496 (Bankr. W.D. Mo. 1980). The interest to be protected by virtue of the adequate protection requirement is the lesser of the amount of the debt or the value of assets securing the debt as of the Petition Date. See Bankers Life Ins. Co. of Neb. v. Alyucan Interstate Corp. (In re Alyucan Interstate Corp.), 12 B.R. 803, 808 (Bankr. D. Utah 1981) ("[T]he 'interest in property' entitled to protection is not measured by the amount of the debt but by the value of the lien.").

27.     As mentioned above, it is anticipated that the Prepetition Agent, Security Agent and certain of the Prepetition Lenders will not object to the priming of their liens on the terms set forth in the DIP Agreement and DIP Order. See DIP Order ¶ 16. In addition, the Debtors submit that the Prepetition Lenders are adequately protected by the adequate protection package provided for in the Cash Collateral Order.

28.     Pursuant to the Cash Collateral Order, the Prepetition Lenders have been granted replacement liens on postpetition collateral and superpriority claims under section 507(b) of the Bankruptcy Code. It is commonplace for prepetition secured lenders to be granted replacement liens and superpriority claims. See, e.g., O'Connor, 808 F.2d at 1396-98 (allowing the debtor to replace a lien on cash with a lien on property likely to be worth five times as much); Owens-Corning Fiberglas Corp. v. Ctr. Wholesale, Inc. (In re Ctr. Wholesale, Inc.), 759 F.2d 1440, 1450 (9th Cir. 1985) (observing that a lien on additional property of the debtor would likely constitute adequate protection for the secured creditor).

29.     Under the Cash Collateral Order, the Debtors are paying certain fees and expenses of the Prepetition Agent's and Priority Lenders' professionals and are making certain other adequate protection payments.  Courts have recognized that payment of fees and expenses can constitute a component of adequate protection.  See, e.g., In re Adelphia Commc'ns Corp., 368 B.R. 140, 279-80 (Bankr. S.D.N.Y. 2007) (permitting payment of expenses and fees to oversecured lenders as adequate protection).  The periodic cash payment of current interest is clearly a generally accepted form of adequate protection.  See 11 U.S.C. § 361(1); see also In re Swedeland Dev. Group, Inc., 16 F.3d at 564 (observing that cash payments constitute a form of adequate protection under section 361 of the Bankruptcy Code); In re Crockett, 3 B.R. 365, 368 (Bankr. N.D. Ill. 1980) (payment of interest accepted as a form of adequate protection).  For the avoidance of doubt, however, the accrued and unpaid interest on the Prepetition Obligations will not be paid in cash during the chapter 11 cases unless the Court orders otherwise and shall instead be added to the claims of the Priority Agent and Prepetition Lenders under the Prepetition Credit Agreement.

30.     Furthermore, financial and other reporting like that required by the Cash Collateral Order is often a component of the adequate protection provided to secured creditors.  See, e.g., In re 5877 Poplar, L.P., 268 B.R. 140, 150 (Bankr. W.D. Tenn. 2001) (finding adequate protection where, among other things, the debtors agreed to provide operating reports to the lender and permit inspection of the premises upon lender's reasonable request).

31.     Finally, although not expressly characterized as a component of the adequate protection package in the Cash Collateral Order, the Debtors submit that the Prepetition Lenders' interests will be adequately protected by the use of the DIP Financing to fund day-to-day operations and administrative expenses incurred in maintaining and preserving the

Prepetition Collateral in accordance with the Budget. In an analogous context, courts have routinely found that use of cash collateral to continue operating and preserve the going concern value of a debtor's business and to preserve the value of a prepetition secured lender's collateral may constitute adequate protection. See, e.g., In re 499 W. Warren St. Assocs., Ltd. P'ship, 142 B.R. 53, 56-57 (Bankr. N.D.N.Y. 1992) (finding secured creditor's interest in collateral adequately protected when cash collateral was applied to normal operating and maintenance expenditures on collateral property); In re Atrium Dev. Co., 159 B.R. 464, 471 (Bankr. E.D. Va. 1993) (denying the use of cash collateral where creditor was already paying operational expenses, but noting that "[a]dequate protection is typically established by the fact that cash is being used to maintain and enhance the value of the underlying income producing real property in which the creditor also usually holds a security interest."); In re Constable Plaza Assocs., L.P., 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991) (debtor entitled to use cash collateral to operate and maintain office building, thereby protecting secured lender's collateral).

32.     Likewise, the Prepetition Lenders here will be adequately protected by the Debtors' use of the DIP Loans to preserve the going concern value of the Debtors' businesses in an effort to avoid a forced liquidation scenario. Although there is some risk associated with the priming of the Prepetition Lenders' liens, the risk is small, particularly given the relatively small dollar amount of the DIP Loans to be extended and when compared to the substantial risk that the value of the Prepetition Collateral will decline dramatically if the Debtors cannot maintain sufficient liquidity to preserve the going concern value of their businesses. As the Debtors will be prepared to demonstrate at the hearing on the Motion, maintaining the Debtors' businesses as a going concern will yield values in excess of any values that otherwise would be derived by a shut-down of business operations and a wholesale liquidation at distressed prices.

33.     The Debtors submit that the Prepetition Lenders, who would receive reduced recoveries in a piecemeal liquidation of the Debtors' assets, will not be any worse off if the Debtors are authorized to obtain the DIP Financing, especially considering that the proposed use of the DIP Financing and the corresponding maintenance and preservation of the Debtors' businesses protects the value of the Debtors' inventory and their important relationships with their customers.  As a result, the use of DIP Financing in the Debtors' normal business operations provides additional adequate protection to the Prepetition Lenders.

34.     Along those lines, the use of the DIP Financing pursuant to the Budget provides an additional layer of adequate protection because the Budget ensures that the Debtors' expenditure of cash will be limited to only those items that are necessary and essential to fund their ongoing operations and preserve the value of the Prepetition Collateral.  Accordingly, the interests of the Prepetition Lenders (as well as those of the Debtors' other creditors and parties in interest) will be best served by permitting the Debtors to obtain the DIP Financing.

35.     In sum, because it is expected that the Prepetition Agent, Security Agent and certain of the Prepetition Lenders will not object and because such parties are receiving adequate protection under the Cash Collateral Order and by the proposed use of DIP Financing in accordance with the Budget, the Court should approve the priming lien financing proposed in the DIP Agreement and the DIP Order.

**3.      The DIP Facility Is Necessary to Preserve the Assets of the Estates**

36.     The liquidity to be provided by the DIP Facility is necessary to preserve and maintain the going concern value of their assets so that the Debtors may move forward with their viable plan to recapitalize.  The Debtors need the DIP Facility to avoid a forced liquidation of their assets on a "fire-sale" basis to the detriment of all creditors.  See In re Sun Healthcare

Group, Inc., 245 B.R. 779, 781 (Bankr. D. Del. 2000) (noting that the court had approved debtor-in-possession financing to, "permit the Debtors to continue to operate to preserve their estates").

**4.    The DIP Agreement Terms Are Fair, Reasonable and Appropriate**

37.    The terms of the DIP Agreement and the DIP Documents are fair, reasonable and appropriate under the circumstances.

38.    As part of the negotiations of the larger restructuring plan contemplated by the PSA, the Debtors requested that the Supporting Lenders provide a limited amount of postpetition financing in order to ensure that the Debtors could satisfy their postpetition liquidity needs during the period of time it would take to implement that restructuring plan through the disclosure statement and plan process.  Thereafter, the Debtors carefully evaluated the proposed financing structure and engaged in good faith arms' length negotiations with the DIP Agent and the DIP Lenders regarding the terms of the DIP Facility.[8]  Additionally, the Debtors worked with their various advisors to evaluate whether the pricing from the DIP Lenders is on market terms.

39.    Based upon the Debtors' evaluation of comparable debtor-in-possession loans, the interest rates and fees under the proposed DIP Facility appear to be consistent with the existing market for debtor-in-possession loans of this nature.  To illustrate further that the terms are fair, reasonable and adequate, the security interests and administrative expense claims granted to the DIP Agent and the DIP Lenders will be subject to the Carve-Out.  In In re Ames Dep't Stores, the court found that such "carve-outs" are not only reasonable, but are necessary to ensure that official committees and the debtor's estate will be assured of the assistance of counsel.  115 B.R. 34, 40-41 (Bankr. S.D.N.Y. 1990) (requiring addition of a carve-out for professionals prior to approving the debtors' financing arrangement).

---

[8]    For this reason, the DIP Agent and the DIP Lenders should be accorded the protection against, inter alia, modification or reversal on appeal provided under section 364(e) of the Bankruptcy Code.

40.     For the foregoing reasons, the Debtors eventually concluded, in an exercise of their sound business judgment, that the financing to be provided by the DIP Agent and the DIP Lenders pursuant to the terms of the DIP Order and the DIP Documents is a necessary bridge to their emergence from chapter 11, is best suited to their needs and is the best financing presently available to the Debtors.

41.     Bankruptcy courts consistently defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious.  See Trans World Airlines, Inc. v. Travellers Int'l AG. (In re Trans World Airlines, Inc.), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that an interim loan, receivables facility and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment . . . [were] reasonable under the circumstances and in the best interests [of the debtor] and its creditors"); In re Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("In exercising [the debtor's] business judgment of conducting its drilling operations, it has found it necessary to obtain loans to make these endeavors possible.").  In fact, "[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985); see also Simasko Prod., 47 B.R. at 449 ("Business judgments should be left to the board room and not to this Court." (quoting In re Lifeguard Indus. Inc., 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983)).  Consistent with this authority, the Debtors respectfully submit that the Court should approve the Debtors' decision to accept and enter into the proposed DIP Facility.

**B.** **The Court Should Approve the Payment of the Fees and Expenses Under the DIP Financing Including the Payment of the Alternative Transaction Fee**

42.     Bankruptcy Code section 363(b)(1) permits a chapter 11 debtor to use property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1).  Because the Debtors' compliance with their obligations under the Commitment Letter, including the payment of the Alternative Transaction Fee and the Expenses would be "outside the ordinary course and prior to chapter 11 plan confirmation," the Debtors must demonstrate a sound business justification for such a use of estate property.  See In re Summit Global Logistics, Inc., Nos. 08-11566, 08-11568, 08-11573, 08-11574, 08-11577, 08-11579, 08-11580, 08-11581, 08-11584, 08-11588, 08-11591, 08-11593, 08-11595, 08-11597, 08-11599, 08-11600, 08-11601, 2008 WL 819934, at * 9 (Bankr. D.N.J. Mar. 26, 2008); see also Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (a court must find that a good business reason exists to grant a debtor's motion under section 363(b)).

43.     The Debtors submit that a sound business justification exists for the Debtors to comply with their obligations under the Commitment Letter including payment of the Alternative Transaction Fee and Expenses.  The transactions contemplated by the Commitment Letter will facilitate the Debtors' businesses and financial restructuring, will make possible an expedient resolution of the chapter 11 cases and are in the best interests of their creditors and other parties-in-interest.  Indeed, the DIP Lenders to whom the Alternative Transaction Fee and Expenses are payable issued the Commitment Letter in connection with the PSA, which has already resulted in the development and filing of a viable plan of reorganization the material terms of which are supported by the DIP Lenders.  Moreover, the Debtors believe that the Alternative Transaction Fee and the Expenses provided for in the Commitment Letter are

reasonable in the context of the Debtors' chapter 11 cases and the transactions contemplated in the Commitment Letter.

44.     The Alternative Transaction Fee represents a small fraction of the DIP Commitments by the DIP Lenders. Moreover, the Debtors' agreement to pay the Alternative Transaction Fee and the Expenses is an integral part of the transactions contemplated under the Commitment Letter. The Alternative Transaction Fee and the Expenses are actual, necessary costs of preserving the estates and should be entitled to administrative priority status under sections 503(b) and 507(a) of the Bankruptcy Code.

45.     The Debtors further submit that the payment of the Alternative Transaction Fee and Expenses constitutes a material inducement for, and a condition of, the DIP Lenders' entry into the Commitment Letter. The proposed DIP Commitments will, inter alia, give the Debtors the financing they need to facilitate the reorganization of their estates. The Third Circuit has stated that a break-up fee may be approved when it is necessary to preserve the value of a debtor's estate. Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 535-36 (3d Cir. 1999).

46.     Furthermore, the Debtors have determined that the amount of the Alternative Transaction Fee is within a range of reasonableness given the nature and size of the DIP Commitments and the circumstances under which the DIP Lenders made the DIP Commitments. The amount of the Alternative Transaction Fee as proposed herein would be two-percent (2%) of the DIP Commitments. Courts have approved similar fees in connection with similar transactions. See, e.g., In re Lionel L.L.C., No. 04-17324 (BRL), 2008 WL 905928, at *10, *13 (Bankr. S.D.N.Y. Mar. 31, 2008) (approving in plan confirmation order commitment letters in connection with $69 million in new debt and equity investments in the reorganized

debtor including all alternative transaction fees thereunder);[9] In re Integrated Res., Inc., 135 B.R. 746, 752-53 (Bankr. S.D.N.Y. 1992) (although applying a different standard than courts apply in the Third Circuit, approving modified break-up fee of up to $6 million payable to entity that would potentially contribute approximately $190,000,000 toward the debtor's plan of reorganization with such break-up fee payable in the event the funding proposal was abandoned), aff'd, Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650 (S.D.N.Y. 1992).

47.     Moreover, in the context of significant asset sales, this Court has recently approved break-up fees ranging from 2.7% to 6.67%.  See, e.g., In re Maxide Acquisition, Inc., Case No. 05-10429 (MFW) (Bankr. D. Del. Mar. 15, 2005) (approving break-up fee of 3.0%, or $2.25 million in connection with a $75 million sale); In re Am. Classic Voyages Co., Case No. 01-10954 (EIK) (Bankr. D. Del. Mar. 20, 2002) (approving break-up fee of 6.67%, or $250,000 in connection with a $3.75 million sale); In re Fruit of the Loom, Inc., Case No. 99-04497 (PJW) (Bankr. D. Del. Dec. 11, 2001) (approving break-up fee of 3.0%, or $25 million, in connection with $835 million sale).

48.     Under O'Brien, break-up fees are evaluated under the same standard as general administrative expenses.  181 F.3d at 535 ("[T]he allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate.").  Since the requested Alternative Transaction Fee is fair and reasonable and is intended to maximize the value of the

---

[9]     See also Notice of Filing of Commitment Letters filed in In re Lionel L.L.C., No. 04-17324 (BRL) (Bankr. S.D.N.Y. Mar. 27, 2008) [D.E. No. 811] (specifying that alternative transaction fee sought in connection with new debt/equity investment was 3% of aggregate purchase price of "Class A" units of the reorganized debtor that commitment letters contemplated would be issued to investors).

Debtors' estates, the Debtors submit that approval of the Alternative Transaction Fee is warranted.

49.     Moreover, the Alternative Transaction is payable only in the event the Debtors consummate a transaction involving the recapitalization of the Debtors' businesses through a stand-alone plan of reorganization or sale of substantially all of the Debtors' assets financed, in whole or in part, by a party or parties *other than* the Prepetition Lenders.  As a result, the Alternative Transaction Fee will only be payable in the seemingly unlikely event that the Debtors consummate a restructuring transaction with a party other than the most interested constituencies in these chapter 11 cases—the Prepetition Lenders.

50.     Based on the foregoing, the Debtors believe that they have exercised sound business judgment in deciding to execute the Commitment Letter.  Accordingly, this Court should (i) authorize the Debtors to perform their obligations under the Commitment Letter and (ii) approve payment of the Alternative Transaction Fee and the Expenses subject to the terms and conditions of the Commitment Letter.

### C.     Modification of the Automatic Stay Is Appropriate

51.     Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a petition under section 301 of the Bankruptcy Code.  11 U.S.C. § 362(a).  The proposed DIP Order contemplates a modification of the automatic stay (to the extent applicable) to the extent necessary to permit the DIP Lenders to perform any act authorized or permitted under or by virtue of the DIP Order or the DIP Documents.  See DIP Order ¶ 9.

52.     Stay modification provisions such as those provided in the proposed DIP Order are, in the Debtors' judgment, reasonable and appropriate under the present circumstances.

Accordingly, the Debtors request that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the DIP Order and the DIP Documents.

### D.     The Proposed Modifications to the Cash Collateral Order Are Appropriate

53.     The proposed DIP Order contemplates that the Cash Collateral Order will be amended as follows:

(a)     In the seventh line of paragraph 9(e), after the words "Cash Collateral," adding the clause "the imposition of liens senior to the liens of the Prepetition Agent, the Security Agent and the Prepetition Lenders";

(b)     In the fifth line of paragraph 13, after the word "from", inserting "(w) the imposition of liens senior to the liens of the Prepetition Agent, the Security Agent and Prepetition Lenders,";

(c)     At the end of subparagraph (j) of paragraph 19, deleting the word "and";

(d)     At the end of subparagraph (k) of paragraph 19, deleting the period and replacing it with a semicolon followed by the word "and"; and

(e)     After subparagraph (k) of paragraph 19, inserting the following subparagraph "(l) the occurrence and continuance of an Event of Default under that certain Debtor-in-Possession Credit Agreement, to be executed and delivered, among the borrower Safety Holdings, and as guarantors, each of the domestic Debtors, and the lenders from time to time party thereto and Nexbank, SSB, as administrative agent and collateral agent for itself and the lenders thereto."

DIP Order ¶ 27.  The proposed modifications to the Cash Collateral Order are, in the Debtors' business judgment, reasonable, appropriate and necessary in light of the proposed DIP Financing, and the Debtors respectfully ask that such modifications be approved by the Court.

### Notice

54.     Notice of the Motion has been provided to the following parties and/or their counsel:  (a) the U.S. Trustee; (b) counsel to the Creditors' Committee; (c) counsel to the Priority Agent; (d) the agent, if any, to the Debtors' second lien lenders or such lenders; (e) counsel to the DIP Agent; (f) all other known parties with liens of record on assets of the Debtors

as of the Petition Date and (g) all parties requesting notices pursuant to Bankruptcy Rule 2002.

The Debtors submit that under the circumstances no other or further notice is necessary.

55.     The Debtors request that the Court consider such notice of the hearing on the Motion to be sufficient notice under Rule 4001.

## **Conclusion**

WHEREFORE, the Debtors respectfully request that the Court enter an order (i) granting the relief sought herein and (ii) granting to the Debtors such further and other relief as the Court may deem proper.

Dated: August 27, 2009
   Wilmington, Delaware

            FOX ROTHSCHILD LLP

            */s/ Eric M. Sutty*
            Jeffrey M. Schlerf (No. 3047)
            Eric M. Sutty (No. 4007)
            919 North Market Street, Suite 1600
            Wilmington, Delaware 19801
            (302) 654-7444

               -and-

            Thomas E Lauria
            Gerard H. Uzzi
            WHITE & CASE LLP
            1155 Avenue of the Americas
            New York, New York 10036
            (212) 819-8200

            Attorneys to the Debtors and Debtors in Possession