# EXHIBIT 2

July 21, 2009

Global Safety Textiles Holdings LLC
Global Safety Textiles Acquisition GmbH
804 Green Valley Road
Suite 300
Greensboro, NC 27408
Attention: Mr. Georg Saint-Denis
             Mr. Frank Goehring

<u>Global Safety Textiles Holdings LLC and Global Safety Textiles Acquisition GmbH</u>
<u>Debtor-In-Possession Facility Commitment Letter</u>

Ladies and Gentlemen:

      Global Safety Textiles Holdings LLC[1] (f/k/a ITG Automotive Safety Holdings LLC f/k/a BST U.S. Holdings, LLC), a Delaware limited liability company (*"Holdings"*) and Global Safety Textiles Acquisition GmbH, a limited liability company duly incorporated and validly existing under the laws of the Federal Republic of Germany (the *"Company"* and collectively with Holdings *"you"*), and certain subsidiaries of Holdings (together with Holdings, collectively, the *"Debtors"*), have informed the undersigned holders of allowed secured priority claims arising under that certain Term and Revolving Facilities Agreement dated December 8, 2006, as amended on April 1, 2007, June 11, 2007, November 16, 2007 and amended and restated on April 15, 2008 (the *"Credit Agreement"*) and the undersigned lenders (the *"DIP Lenders"*)[2] that the Debtors have filed voluntary petitions (the *"Bankruptcy Cases"*) under Chapter 11 of the United States Bankruptcy Code (the *"Bankruptcy Code"*) in the United States Bankruptcy Court for the District of Delaware (the *"Bankruptcy Court"*).

      In connection with the foregoing, you have requested that the DIP Lenders, directly or through one or more of their affiliates, provide a senior secured superpriority debtor-in-possession asset-based revolving credit facility in an aggregate principal amount of $5,000,000, on terms and conditions set forth in this letter and in <u>Annex A</u> hereto (the *"DIP Facility"*). This letter, together with the attached <u>Annex A</u>, shall be referred to herein as the *"Commitment Letter."*

### *Commitments*

      Each of the DIP Lenders hereby severally (and not jointly) commits, directly or through one or more of its affiliates, to provide a portion (as set forth under its signature page below and

---

[1]    Additional borrowers may be included, and in the event Global Safety Textiles Holdings LLC does not join as a party to the Restructuring and Plan Support Agreement, will be substituted, subject to completion of financial, legal, tax and business due diligence.

[2]    The DIP Lenders may include certain of but will not include all of the prepetition lenders under the Credit Agreement.

in an aggregate amount equal to 100% in total) of the DIP Facility (each such commitment, a "***Commitment***" and collectively, the "***Commitments***"), on the terms and subject to the conditions set forth in this Commitment Letter.

### Fees

As consideration for each DIP Lender's respective Commitment under the Commitment Letter, the Debtors hereby agree to pay a non-refundable termination fee (the "***Termination Fee***") to the DIP Lenders (to be allocated in respective proportions to be agreed upon by the DIP Lenders and which may be assigned by the DIP Lenders to one or more of their affiliates) in an amount equal to 2.0% of the combined aggregate amount of the Commitments of the DIP Lenders, which shall be deemed earned in full and which shall be paid immediately upon the Debtors consummating an Alternative Transaction (as defined below) at any time during the term of this Commitment Letter or within 6 months after its termination. For the purposes of this Commitment Letter, an "***Alternative Transaction***" is any transaction involving the recapitalization of the Debtors' businesses through a stand-alone plan of reorganization or sale of substantially all of the Debtors' assets, financed, in whole or in part, by a party or parties other than the lenders under the Credit Agreement.

### Information

The Debtors represent and warrant to the DIP Lenders that (i) all information (other than any Projections (as defined below), other forward-looking statements or information of a general economic nature) that has been or will hereafter be made available to any DIP Lender or any potential DIP Lender by Holdings, the Company or any of their respective subsidiaries or, to the best of the Debtors' knowledge, their respective representatives in connection with the transactions contemplated pursuant to this Commitment Letter or otherwise relating to Holdings, the Company or any of their respective subsidiaries (collectively, the "***Information***") is and will be (when taken as a whole) correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein (taken as a whole) not misleading in any material respect in light of the circumstances under which such statements were or are made and (ii) all projections and other forward-looking statements (the "***Projections***"), including, without limitation, the Budget (as defined in Annex A) and cash flow forecasts, that have been or will be prepared or made by the Debtors and made available to any DIP Lender or any potential DIP Lender have been or will be prepared in good faith based upon reasonable assumptions believed at the time so made to be reasonable (it being understood that projections are not viewed as facts and are subject to significant uncertainties and contingencies, many of which are beyond the Debtors' control, and that no assurance can be given that any projections will be realized, that actual results may differ from those projected and that such differences may be material). The Debtors agree to supplement the Information and Projections they have provided from time to time until the closing date of the DIP Facility (the "***Closing Date***") so that the representations and warranties contained in this paragraph remain correct.

### *Confidentiality*

By accepting delivery of this Commitment Letter, the Debtors agree that this Commitment Letter is for the Debtors' confidential use only and that neither its existence nor any of the terms thereof will be disclosed by the Debtors to any person or entity except that such existence and contents may be disclosed to the directors, officers, employees, affiliates, advisors, representatives and agents of the Debtors on a confidential and "need-to-know" basis and only in connection with the transactions contemplated hereby. Notwithstanding the foregoing, following the Debtors' acceptance of the provisions hereof and their return of an executed counterpart of this Commitment Letter as provided below, (i) the Debtors may file a copy of any portion of this Commitment Letter in any public record in which they are required by law (including pursuant to any court order or decree or any rule or regulation) to be filed, (ii) the Debtors may make such other public disclosures of any of the terms and conditions hereof as the Debtors are required by law, in the opinion of their counsel, to make, (iii) the Debtors may file a copy of this Commitment Letter in any proceeding relating to the Bankruptcy Cases or in any document prepared in connection therewith, (iv) the existence and contents of this Commitment Letter may be disclosed to the directors, officers, employees, affiliates, advisors and agents of the lenders under the existing senior secured credit facilities of the Debtors on a confidential and "need-to-know" basis and only in connection with the transactions contemplated hereby, (v) the Debtors may disclose this Commitment Letter and the terms and conditions hereof, if required under applicable law or an order of a court of competent jurisdiction and using best efforts to file this Commitment Letter and the terms and conditions hereof under seal, in connection with the exercise of their rights under this Commitment Letter and (iv) the Debtors may disclose this Commitment Letter and the terms and conditions hereof to (x) potential and existing customers, vendors and suppliers to the extent the Debtors in their good faith judgment determine that such disclosure is required to maintain or develop material business relationships, (y) W.L. Ross & Co. LLC, its affiliates, and their respective representatives and agents and (z) any other bona fide potential purchasers that have submitted a specific proposal to acquire a controlling interest in the Debtors. The Debtors' obligations hereunder with respect to confidentiality and disclosure shall survive the expiration or termination of this Commitment Letter.

Each DIP Lender agrees that it will treat any Information and Projections received by Holdings or the Company in connection herewith in accordance with the information disclosure provisions of the Credit Agreement.

### *Conditions*

The Commitments and other undertakings hereunder are subject to (a) the preparation, execution and delivery of definitive documentation for the DIP Facility and other customary documents reasonably acceptable to the DIP Lenders and their counsel (the *"Loan Documents"*); (b) the absence of a material adverse effect on the properties, financial condition, or results of operations of Holdings, the Company and their respective subsidiaries (taken as a whole) since the date hereof (a *"Material Adverse Effect"*); provided, that in no event shall any of the following, alone or in combination, be taken into account in determining whether there has been a Material Adverse Effect: (1) any effect resulting the announcement of commencement of the Debtors' chapter 11 cases, the filing of the Debtors' chapter 11 cases, the announcement of the Restructuring (as defined in the Restructuring and Plan Support Agreement entered into in

connection with this Commitment Letter), the pendency of the Debtors' chapter 11 cases, the public announcement of and compliance with the terms and conditions of this Agreement or the transactions contemplated hereby; (2) any effect resulting from national or international economic, political or social conditions, including acts of war, acts of terrorism or natural disasters, including the worsening thereof; (3) any loss of business from Autoliv; (4) any acts or omissions of the DIP Lenders or acts or omissions to which the DIP Lenders have agreed in writing; (5) conditions or effects that generally affect the industries and markets in which the Holdings, the Company and their respective subsidiaries (taken as a whole) operate, so long as such effect does not disproportionately affect the Holdings, the Company and their respective subsidiaries relative to other similarly situated companies; (6) effects resulting from changes generally affecting financial, banking, credit, securities or commodities markets, the economy in general, prevailing interest rates or general capital market conditions in the United States or in those countries in which Holdings, the Company and their respective subsidiaries (taken as a whole) operate, so long as such effect does not disproportionately affect the Holdings, the Company and their respective subsidiaries relative to other similarly situated companies; (7) compliance with applicable laws, orders, agreements (to the extent disclosed to the DIP Lenders as of the date hereof), accounting requirements or principles, any proceeding, action or order before a governmental authority (each only to the extent that it is in effect as of the date hereof), so long as such effect does not disproportionately affect the Holdings, the Company and their respective subsidiaries (taken as a whole) relative to other similarly situated companies; or (8) any failure by Holdings, the Company and their respective subsidiaries to meet their internal or published projections, budgets, plans or forecasts of its revenues, earnings or other financial performance or results of operations, in and of itself (it being understood that the facts or occurrences giving rise or contributing to such failure that are not otherwise excluded from the definition of a "Material Adverse Effect" (including without limitation the loss of business from a material customer other than Autoliv) shall be taken into account in determining whether there has been a Material Adverse Effect; (c) the accuracy in all material respects of all representations that the Debtors make to the DIP Lenders and all Information that the Debtors furnish to the DIP Lenders; (d) the Debtors' compliance in all material respects with the terms of this Commitment Letter; (e) the Bankruptcy Court having entered the Interim Order (as such term is defined in Annex A); and (h) the occurrence of the Closing Date on or before August 31, 2009 (such date, as the same may be extended by the DIP Lenders in writing, the *"Commitment Expiration Date"*).

### *Termination*

The Commitment of each DIP Lender will terminate on the earlier of (i) the Commitment Expiration Date, (ii) the date that any insolvency proceedings are filed by any of the Debtors' non-debtor subsidiaries in respect of their own assets (other than chapter 11 cases jointly administered with the Bankruptcy Cases), (iii) the date that any insolvency proceedings are filed in respect of the Debtors' non-debtor subsidiaries by any party other than such Debtors non-debtor subsidiaries, unless such filing is dismissed within 10 business days, (iv) the date that the Debtors file any motion to approve of a sale of substantially all of their assets (including without limitation a motion to approve bidding procedures in connection with such a sale) in the Bankruptcy Cases, (v) the date of termination of the Restructuring and Plan Support Agreement to which this Commitment Letter is attached and (iv) August 31, 2009, if on such day the Bankruptcy Court has not entered the Interim Order. Prior to the Commitment Expiration Date,

4

the Commitments may be terminated by the Debtors at any time at their option upon payment of all fees, expenses or other amounts then due and owing hereunder. The expense reimbursement, confidentiality, fees, indemnification and governing law provisions, as well as any other provision that expressly so provides, will survive the termination of this Commitment Letter. If the Interim Order or the Final Order (as such term is defined in Annex A) shall at any time cease to be in full force and effect or shall be reversed, stayed or modified in any manner without the prior consent of the DIP Lenders, then the DIP Lenders may terminate this agreement.

### *Indemnification; Expense Reimbursement*

By your acceptance of this Commitment Letter, you hereby agree to indemnify and hold harmless the DIP Lenders and their respective affiliates (including, without limitation, controlling persons) and the directors, officers, employees, advisors and agents of the foregoing in each case only in their capacity as a lender providing its Commitment, making the loans contemplated hereunder and not in other capacity (including, without limitation, as an existing lender to, Holdings, the Company or any of their respective subsidiaries) (each, an "*Indemnified Person*") from and against any and all losses, claims, costs, expenses, damages or liabilities (or actions or other proceedings commenced or threatened in respect thereof) that arise out of, result from or in any way relate to this Commitment Letter, the DIP Facility or any of the transactions contemplated hereby or the providing of the DIP Facility, and to reimburse each Indemnified Person upon its demand for any legal or other expenses incurred in connection with investigating, preparing to defend or defending against, or participating in, any such loss, claim, cost, expense, damage, liability or action or other proceeding (whether or not such Indemnified Person is a party to any action or proceeding), except as to any Indemnified Person, severally and not jointly, to the extent that any such loss, claim, cost, expense, damage or liability is determined by a final, non-appealable judgment of a court of competent jurisdiction to have resulted by reason of the gross negligence or willful misconduct of such Indemnified Person in performing the services that are the subject of this Commitment Letter. You shall not be liable for any settlement of any such proceeding effected without your written consent, but if settled with such consent or if there shall be a final non-appealable judgment for the plaintiff, you shall indemnify the Indemnified Persons from and against any loss or liability by reason of such settlement or judgment subject to your rights in this paragraph to claim exemption from your indemnity obligations. You shall not, without the prior written consent of any Indemnified Person, effect any settlement of any pending or threatened proceeding in respect of which such Indemnified Person is or could have been a party and indemnity could have been sought hereunder by such Indemnified Person, unless such settlement includes an unconditional release of such Indemnified Person from all liability or claims that are the subject matter of such proceeding. You also agree that no Indemnified Person shall have any liability to Holdings, the Company or any of their respective subsidiaries, affiliates or stockholders or any other person or entity in connection with or as a result of any matter referred to in this Commitment Letter, the DIP Facility or the transactions contemplated hereby except to the extent that any losses, claims, damages, liabilities or expenses incurred by such persons or entities result from the gross negligence or willful misconduct of such Indemnified Person in performing the services that are the subject of this Commitment Letter; *provided, however,* that in no event shall such Indemnified Person have any liability for any indirect, special, consequential or punitive damages in connection with or as a result of such Indemnified Person's activities related to this Commitment Letter. The Debtors agree that the DIP Lenders are not providing accounting, tax

5

or legal advice to the Debtors in connection with the DIP Facility or otherwise and that the Debtors have consulted their own advisors with respect to such matters.

In addition, you agree to reimburse the DIP Lenders from time to time for all reasonable, documented out-of-pocket costs and expenses (including reasonable documented travel expenses and reasonable documented fees, disbursements and other charges of counsel) incurred in connection with the preparation of this Commitment Letter and the definitive documentation for the DIP Facility, regardless of whether the transactions contemplated hereby are consummated or any Loan Documents actually executed. The provisions contained in this paragraph shall remain in full force and effect notwithstanding the termination of this Commitment Letter.

### *Miscellaneous*

This Commitment Letter and the Commitments and undertakings hereunder shall not be assignable by (a) the Debtors without the prior written consent of the DIP Lenders or (b) the DIP Lenders without the prior written consent of the Debtors; provided, that the DIP Lenders may assign their respective Commitments hereunder to one or more of their respective lending affiliates without the prior written consent of the Debtors. This Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by each of the parties hereto. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile or electronic transmission shall be effective as delivery of a manually executed counterpart of this Commitment Letter. This Commitment Letter is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person or entity other than the parties hereto. By executing this Commitment Letter, the Debtors acknowledge that this Commitment Letter is the only agreement between the Debtors and the DIP Lenders or their affiliates with respect to the DIP Facility (other than the Loan Documents to be executed on the Closing Date in connection with the DIP Facility) and sets forth the entire understanding of the parties with respect to the subject matter hereof.

**This Commitment Letter shall be governed by, and construed in accordance with, the laws of the State of New York without regard to principles of conflicts of laws. The Debtors agree for themselves and their affiliates that any suit or proceeding arising in respect to this Commitment Letter or the commitments or agreements of the DIP Lenders hereunder will be tried in the Bankruptcy Court, or in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, in the U.S. District Court for the Southern District of New York or, if that court does not have subject matter jurisdiction, in any state court located in the City and County of New York, and the Debtors agree to submit to the exclusive jurisdiction of, and to venue in, such court. Each party hereto irrevocably waives all right to trial by jury in any action or proceeding arising out of or relating to this Commitment Letter or the transactions contemplated hereby.**

The DIP Lenders hereby notify you that pursuant to the requirements of the USA Patriot Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "*Patriot Act*"), the DIP Lenders are required to obtain, verify and record information that identifies the Company or

Holdings, which information includes the name, address, tax identification number and other information regarding the Debtors that will allow the DIP Lenders to identify the Debtors in accordance with the Patriot Act. This notice is given in accordance with the requirements of the Patriot Act and is effective as to each DIP Lender.

Please indicate your acceptance of the terms hereof by signing in the appropriate space below and returning to the DIP Lenders the enclosed duplicate originals of this Commitment Letter, not later than 5:00 p.m., New York time, on July 28, 2009, at which time (if not so accepted prior thereto) this Commitment Letter and the Commitments and undertakings hereunder will expire.

Very truly yours,

Name of Institution:

IKB DEUTSCHE INDUSTRIE BANK AG,
CONDON BRANCH

Name of Authorized Signatory:

Stuart Geddis
Senior Manager

Kerry McGill
Director

Amount of Commitment:

**$930,000**

Date:

21 JULY 2009

Very truly yours,

Name of Institution:

GE Leveraged Loans Limited

Name of Authorized Signatory:

GALINA MARKOVA
AUTHORISED SIGNATORY

Nicole Gates
Managing Director

Amount of Commitment:

$1,000,000   ONE MILLION DOLLARS

Date:

20 July 2009

Very truly yours,

_____

Name of Institution: Landesbank Baden-Württemberg

_____

Name of Authorized Signatory:

Dr. Christoph Nitsche          Raphael Wenger

_____

Amount of Commitment:

USD 550,000

(five hundred fifty thousand US dollar)

_____

Date: 21/07/2009

_____

Very truly yours,

---

Name of Institution:

Highland Credit Opportunities CDO Ltd
By: Highland Capital Management, L.P.,
As Collateral Manager
By: Strand Advisors, Inc.,
Its General Partner

James D. Dondero, President
Strand Advisors, Inc., General Partner of
Highland Capital Management, L.P.

Name of Authorized Signatory:

---

Amount of Commitment:

**$1,590,000**

Date:

07/20/2009

Very truly yours,

**Sankaty Credit Opportunities IV, L.P.**

_____

Name of Institution:

Alan K. Halfenger
Chief Compliance Officer
Assistant Secretary

Name of Authorized Signatory:

_____

Amount of Commitment:

**$232,500**
_____

Date:

_____

Very truly yours,

Sankaty Credit Opportunities Ⅲ L.P.

_____

Name of Institution:

Alan K. Halfenger
Chief Compliance Officer
Assistant Secretary

_____

Name of Authorized Signatory:

_____

Amount of Commitment:

**$232,500**

_____

Date:

_____

Very truly yours,

Sankaty Credit Opportunities II, L.P.

_____

Name of Institution:

Alan K. Halfenger
Chief Compliance Officer
Assistant Secretary

Name of Authorized Signatory:

_____

Amount of Commitment:

**$232,500**

_____

Date:

_____

Very truly yours,

**Sankaty Credit Opportunities (Offshore Master) IV, L.P.**

Name of Institution:

Alan K. Halfenger
Chief Compliance Officer
Assistant Secretary

Name of Authorized Signatory:

Amount of Commitment:

**$232,500**

Date:

*CONFIDENTIAL*

GLOBAL SAFETY TEXTILES HOLDINGS LLC

By: _____

Date: _____

GLOBAL SAFETY TEXTILES ACQUISITION
GMBH

Anthony J. Forman, Managing Director
By: _____Anthony J. Forman_____

Date: _____

## <u>ANNEX A</u>

DIP TERM SHEET

Global Safety Textiles Holdings LLC and Global Safety Textiles Acquisition GmbH
Debtor-in-Possession Revolving Credit Facility

*THIS TERM SHEET IS PROFFERED IN THE NATURE OF A SETTLEMENT PROPOSAL IN FURTHERANCE OF SETTLEMENT DISCUSSIONS, AND IS INTENDED TO BE ENTITLED TO THE PROTECTIONS OF FEDERAL RULE OF EVIDENCE 408 AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL INFORMATION AND INFORMATION EXCHANGED IN THE CONTEXT OF SETTLEMENT DISCUSSIONS. THE TERMS PRESENTED IN THESE TERM SHEETS ARE SUBJECT TO THE CONDITIONS SET FORTH HEREIN.*

*THE TERMS PRESENTED IN THIS DIP FACILITY TERM SHEET ARE SUBJECT TO PRESENTATION OF A BUDGET DEMONSTRATING THE COMPANY'S FUNDING NEEDS AND THE OTHER TERMS AND CONDITIONS SET FORTH HEREIN.*

*Capitalized terms used, but not otherwise defined herein, shall have the meanings given to them in that certain Restructuring and Plan Support Agreement, dated as of July 21, 2009 (the "Restructuring and Plan Agreement").*

## SUMMARY OF PRINCIPAL TERMS AND CONDITIONS

Borrower[1]:

Global Safety Textiles Holdings LLC (f/k/a ITG Automotive Safety Holdings LLC f/k/a BST U.S. Holdings, LLC), a Delaware limited liability company and Global Safety Textiles Acquisition GmbH (f/k/a ITG Automotive Safety Textiles Acquisition GmbH f/k/a BST Safety Textiles Acquisition GmbH), a limited liability company duly incorporated and validly existing under the laws of the Federal Republic of Germany.

Guarantors:

(1) Subsidiaries acting as guarantors under that certain Term and Revolving Facilities Agreement dated December 8, 2006 (as amended from time to time and amended and restated on April 15, 2008, the "Prepetition Facility") by and among the Borrowers, Global Safety Textiles GmbH (f/k/a ITG Automotive Safety Textiles GmbH f/k/a BST Safety Textiles GmbH), a limited liability company duly incorporated and validly existing under the laws of the Federal Republic of Germany, Global Safety Textiles LLC (f/k/a/ ITG Automotive Safety Textiles LLC f/k/a BST Safety Textiles, LLC), a Georgia limited liability company, GST Automotive Safety Components International, Inc. (f/k/a ITG Automotive Safety Components International, Inc. f/k/a Automotive Safety Components International, Inc.), a Delaware corporation, GST Automotive Safety UK Ltd, a limited liability company incorporated in the United Kingdom, each as a borrower, the guarantors party thereto, the lenders party thereto from time to

---

[1]  Additional borrowers may be included, and in the event Global Safety Textiles Holdings LLC does not join as a party to the Restructuring and Plan Support Agreement, will be substituted, subject to completion of financial, legal, tax and business due diligence.

time (the "Existing Lenders"), Goldman Sachs Credit Partners L.P. and UBS Securities LLC, as lead arrangers, Goldman Sachs Credit Partners L.P., as priority agent, and UBS AG, Stamford Branch, as second lien agent (collectively, the "Existing Agents"); and

(2) all future direct and indirect domestic and foreign subsidiaries of the Borrower (collectively, the "Guarantors" and, together with the Borrower, the "Debtors" or "Debtor Parties").

Guarantees are to be subject to applicable local law restrictions and limitations, but in any event, the guarantees granted by Czech, German, U.S. and Romanian guarantors shall be consistent with the guarantees under the Prepetition Facility.

| | |
|---|---|
| Administrative Agent: | TBD |
| Arranger: | TBD |
| DIP Lenders: | Certain (but not all) of the lenders under the Prepetition Facility (or their affiliates) and other financial institutions reasonably acceptable to the Borrower as may be selected by the Arranger. |
| DIP Commitments and Funding of DIP Loans: | Commitments of DIP Lenders (collectively, the "DIP Commitments") to provide loans (the "DIP Loans") in an aggregate amount of $5 million (the "DIP Facility"). |

Upon entry of a final order authorizing and approving the DIP Facility (the "Final Order"), the Borrower shall draw all amounts available under the DIP Commitment and place such funds into a deposit account (the "Collateral Account") subject to the DIP Liens. Use of the proceeds of the DIP Facility held in the Collateral Account shall be governed by the terms and conditions contained herein relating to Use of Proceeds and Availability.

Use of Proceeds:
The proceeds of the DIP Facility held in the Collateral Account shall be subject to, and released to be used solely in a manner consistent with, the Budget (as defined below) (a) to fund postpetition operating expenses and other general corporate needs, including working capital needs and (b) to pay certain administrative expenses of the Chapter 11 Cases, including reasonable fees and expenses of professionals to be specified (including, without limitation, reasonable fees and expenses of counsel to the Administrative Agent and each of the DIP Lenders and a financial advisor to the Administrative Agent, consistent with the Prepetition Facility).

Budget:
The initial eight-week budget shall be prepared and delivered by the Borrower on or prior to the Closing Date and shall reflect projected cash receipts, operating disbursements, payroll disbursements, non-operating disbursements and cash balances on a weekly basis and shall be in form and substance acceptable to the Required Lenders (as defined below). The initial eight-week budget shall include, in addition to the eight weeks following the Closing Date, the actual

cash receipts, operating disbursements, payroll disbursements, non-operating disbursements and cash balances for the three-week period immediately prior to the Closing Date. Such budget shall be updated bi-weekly to cover the then succeeding eight-week period (each such updated budget a "Proposed Budget"). Unless the Administrative Agent provides written notice to the Borrower within ten days after receipt of any Proposed Budget that the Proposed Budget has not been approved, the Proposed Budget shall effectively become part of the Budget (such budget, and each subsequent rolling eight-week budget delivered by the Borrower after the Closing Date, in each case, as so amended, the "Budget"). For the purposes of such approvals, if the Administrative Agent has approved or has been deemed to approve a Proposed Budget then the Administrative Agent's approval of any subsequent Proposed Budget shall only be required for those weeks not covered by any previous Proposed Budget approved (or deemed approved) by the Administrative Agent unless the Borrower shall have modified a line item in a previously approved Proposed Budget. For the avoidance of doubt, the Borrower and Administrative Agent may mutually agree to modify line items in a Proposed Budget for weeks that have been previously approved by the Administrative Agent.

Maturity:

Earliest of (i) the date on which all the DIP Loans have been indefeasibly repaid in full in cash and all of the DIP Commitments have been permanently and irrevocably terminated, (ii) the "Effective Date" of the Plan of Reorganization, (iii) October 31, 2009, (iv) the date of the closing of a sale of all or substantially all of the Debtor Parties' assets pursuant to section 363 of the Bankruptcy Code and (v) the date that the Debtors' Chapter 11 cases are converted into cases under Chapter 7 of the Bankruptcy Code or dismissed.

Roll-Over of DIP Lender
Commitments:

Upon the "Effective Date" of the Plan of Reorganization, (i) the full amount of any outstanding loans and unfunded commitments of each DIP Lender under the DIP Facility shall automatically be converted into loans and unfunded commitments, as applicable, under the First Lien Facility (as defined in Exhibit C to the Restructuring and Plan Support Agreement) or (ii) the full amount of any outstanding loans under the DIP Facility shall be repaid in full in cash from the proceeds of an exit financing facility.

Closing Date:

The portion of the DIP Facility to be available after entry of the Interim Order shall be consummated no later than 60 business days after June 30, 2009 (the "Petition Date") (or such later date to which the Debtors and the Borrower have agreed), and the entire DIP Facility shall be approved by the Bankruptcy Court and consummated no later than 75 business days after the Petition Date (or such later date to which the Borrower and the DIP Lenders have agreed).

Availability:

The funds in the Collateral Account shall be released only upon satisfaction (or waiver by the Required Lenders) of customary conditions precedent, including prior written notice, maximum

3

aggregate group cash balance (exclusive of amounts in the Collateral Account), the accuracy of representations and warranties and, prior to and after giving effect to such draw, the absence of any default or Event of Default, in an aggregate amount ("Availability") not to exceed at any time outstanding the least of: (i) $5,000,000, (ii) the applicable amount set forth in the Budget and (iii) the Borrowing Base, but including a reserve for the carve-out amount of $200,000 for payment of professional fees, U.S. Trustee fees and other similar administrative costs (the "Carve-Out Reserve"). Other than the Carve-Out Reserve, all other reserves against Availability shall be established in the sole discretion of the Administrative Agent. Amounts drawn from the Collateral Account may be made by the Borrower, returned and re-drawn at any time after the Closing Date to and including the second business day preceding the Maturity Date subject to satisfaction or waiver of all related conditions precedent.

Borrowing Base:
Subject to eligibility criteria determined in a manner reasonably satisfactory to the Administrative Agent and calculated as follows:

Eligible Accounts Receivable: 50% of asset value included

Eligible Machinery: 10% of asset value included

Eligible Inventory: 25% of asset value included

Interest:
Adjusted LIBOR rate plus 10.00%, for interest periods of 1, 2 or 3 months, subject to a LIBOR "floor" of 3.00% (the "Applicable Interest Rate").

Default Interest:
After the occurrence and during the continuance of an Event of Default, interest on all amounts then outstanding will accrue at a rate equal to the Applicable Interest Rate, plus an additional 2.00% *per annum*, payable on demand.

Initial Fee:
A fee of 3.00% of the DIP Facility, payable to the Administrative Agent, for the benefit of the DIP Lenders, to be paid upon the entry of the Interim Order.

Arrangement Fee:
A fee to Arranger as set forth in a separate fee letter, to be paid upon the entry of the Interim Order.

Exit Fee:
A non-recurring fee of 3.00% of the DIP Commitments to be paid to the Administrative Agent upon the Maturity Date in the event that the DIP Facility is not converted into the First Lien Facility under the Plan of Reorganization (and ratably upon any reduction, in whole or in part, of the commitments, for allocation to the DIP Lenders of record at the time of such payment (or buyers therefrom pursuant to the terms of open trade confirmations in respect thereof).

Roll-Over Fee:
A non-recurring fee of 6% of the DIP Commitments to be paid to the Administrative Agent on the Effective Date of the Plan of Reorganization in the event that the DIP Facility is converted into

4

the First Lien Facility.

All fees payable to the Administrative Agent for the benefit of the DIP Lenders shall be fully earned on the date such payment is due and shall be non-refundable.

Optional Prepayments: Permitted in whole or in part, with prior notice but without premium or penalty and including accrued and unpaid interest. Each partial prepayment shall be in an amount that is an integral multiple of $500,000.

Mandatory Prepayments and Return of Funds: In a manner customary for financings of this type, including, without limitation, (i) in an amount equal to 100% of the Net Cash Proceeds (to be mutually defined) of certain proceeds from non-ordinary course asset sales and insurance and condemnation payments; (ii) an amount equal to 100% of Net Cash Proceeds received from the issuance of debt (other than debt permitted thereunder) and (iii) in an amount equal to the amount, if any, required from time to time, to replenish the Collateral Account to assure that aggregate amounts withdrawn therefrom do not exceed the Borrowing Base (such amount, the "Overadvance"). Loans shall be prepaid and/or commitments reduced, and the Collateral Account replenished, in the order set forth below.

There will be no prepayment penalties (other than LIBOR breakage costs) for any prepayments (whether mandatory or optional) of the DIP Facility.

Application of Prepayments and Replenishment of Collateral Account: Amounts received in respect of an Overadvance will be applied to replenish the Collateral Account so long as no default or Event of Default shall have occurred and be continuing. Any such amounts received at such time as a default or Event of Default is continuing, and all amounts received in respect of mandatory prepayments, will be applied: *first*, to fees of the agents, and reimbursable expenses of the agents and the DIP Lenders, then due and payable pursuant to the definitive loan documentation; *second*, to interest and other fees then due and payable on the DIP Facility on a *pro rata* basis; *third*, to the principal balance of borrowings outstanding under the DIP Facility on a *pro rata* basis until the same has been repaid in cash in full; and *fourth*, to any other obligations under the DIP Facility.

Amortization: None

Priority and Security: 1. Superpriority claim status in the Chapter 11 Cases.

2. Perfected first priority senior priming liens (collectively, the DIP Liens") on all or substantially assets of the Company Parties, including perfected super senior pledges of all of the equity interests of Borrower and each of the Borrower's direct and indirect subsidiaries, and perfected super senior security interests in and mortgages on all tangible and intangible assets (including, without limitation, accounts receivable, inventory, equipment, general intangibles, intercompany notes, insurance

5

policies, investment property, intellectual property, real property, cash and proceeds of the foregoing) of Borrower and the Guarantors, wherever located, now or hereafter owned, pursuant to section 364(c) and (d) of the Bankruptcy Code (and, to the extent necessary or advisable in the reasonable judgment of legal counsel to the Administrative Agent, pursuant to applicable local commercial law in jurisdictions outside the United States of America) and, upon entry of the Final Order, any avoidance actions under Chapter 5 of the Bankruptcy Code (the "Avoidance Actions"); *provided however*, the Avoidance Actions shall be the last collateral used to repay the DIP Facility.

3.  The DIP Liens will be subject only to (i) certain permitted liens to be determined by the parties prior to final documentation and intended to include certain necessary liens defined as Permitted Security under the Prepetition Facility except to the extent not customary for debtor-in-possession credit facilities or otherwise required by the Required Lenders or the Administrative Agent) and (ii) the Carve-Out (as defined below).

4.  Borrower's and the Guarantor's cash, including all cash and other amounts on deposit or maintained in any account and any proceeds of the Collateral will be "cash collateral" of the DIP Lenders within the meaning of section 363(a) of the Bankruptcy Code.

5.  The DIP Facility will also be secured by a junior lien on all other assets of the Borrower and Guarantors that are subject to valid and perfected liens in existence at the time of commencement of the Bankruptcy Cases or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code pursuant to section 364(c)(3) of the Bankruptcy Code other than the primed liens of the Prepetition Facility, subject only to (i) certain Permitted Security (as defined in the Prepetition Facility) and (ii) the Carve-Out.

All such collateral for the DIP Facility being hereinafter referred to as the "Collateral." The Borrower and the Guarantors shall execute and deliver to the Administrative Agent all such agreements, financing statements, instruments and other documents as the Administrative Agent or any of the Required Lenders may request to evidence, confirm, validate or perfect the liens granted pursuant to the Interim Order.

All obligations of the Borrower under the DIP Facility and all amounts owing by the Guarantors in respect thereof at all times shall constitute allowed superpriority administrative expense claims in the Chapter 11 Cases (the "DIP Administrative Claim") under section 364(c)(1) of the Bankruptcy Code and under the Initial

6

Order, having priority over all administrative expenses of the kind specified in, or ordered pursuant to, sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) or 726 or any other provisions of the Bankruptcy Code, subject only to a carve-out for (i) allowed, accrued, but unpaid professional fees and expenses of the Borrower and Guarantors and professionals for any official committee of unsecured creditors (the "Committee") as set forth in the Budget that are incurred prior to an event of default, (ii) allowed, accrued, but unpaid professional fees and expenses of the Borrower and Guarantors and professionals for any Committee incurred in the Bankruptcy Cases after an event of default (that is not waived or cured) not to exceed in the aggregate an amount TBD (the "Carve-Out Amount") and (iii) the payment of fees pursuant to 28 U.S.C. § 1930 (collectively, the "Carve-Out"). The Carve-Out, cash collateral and any loans under the DIP Facility may not be used to investigate or challenge the validity, perfection, priority, extent, or enforceability of the DIP Facility, or the liens or security interests securing the DIP Facility.

Representations and Warranties: Substantially consistent with Prepetition Facility (as modified or supplemented to reflect the commencement of the Chapter 11 Cases or otherwise in a manner customary for debtor-in-possession credit facilities).

Affirmative Covenants: Substantially consistent with Prepetition Facility (as modified or supplemented to reflect the commencement of the Chapter 11 Cases or otherwise in a manner customary for debtor-in-possession credit facilities), including delivery of financial statements and other reports (consistent with the requirements in the Prepetition Facility); maintenance of existence; payment of taxes and claims; maintenance of properties; maintenance of insurance; cooperation with syndication efforts; books and records; inspections; weekly calls between management and DIP Lenders; fortnightly delivery of 13-week cash flow forecasts; access for DIP Lenders or their advisors to meetings with key customers and suppliers; compliance with laws; environmental matters; additional collateral and guarantors; cash management and further assurances, including, in each case, exceptions and baskets to be mutually agreed upon; provided that the financial covenants shall be as set forth below.

Negative Covenants: Substantially consistent with Prepetition Facility (as modified or supplemented to reflect the commencement of the Chapter 11 Cases or otherwise in a manner customary for debtor-in-possession credit facilities), including limitations with respect to other indebtedness; liens; negative pledges; restricted junior payments (e.g., no dividends, redemptions or voluntary payments on certain debt); restrictions on subsidiary distributions; investments, mergers and acquisitions; sales of assets (including subsidiary interests); sales and lease-backs; capital expenditures; transactions with affiliates; conduct of business; amendments and waivers of organizational documents, junior indebtedness and other material agreements; and changes to fiscal year, including, in each case, exceptions and

7

baskets to be mutually agreed upon.

Financial Covenants:

1. Compliance with the Budget, which shall provide, among other things, that aggregate cash disbursements made during any four-week period then most recently ended shall not exceed 110% of the total cash disbursements for such four-week period as forecasted in the Budget (with any forecasted cash disbursements not made in any particular week permitted to be made in any subsequent week).

2. Minimum EBITDA, tested monthly on a cumulative trailing three month basis, of 80% of the "Adjusted EBITDA (forecast)" TBD.

3. Capital Expenditure limitations TBD.

4. Debt service coverage ratio TBD.

5. Interest coverage TBD.

6. Minimum aggregate group liquidity TBD based on the Budget.

7. Headroom of 30% will be applied in setting the compliance levels applicable to the financial covenants described above.

Financial Reports:

The DIP Documentation will include financial reporting requirements as are usual and customary for financings of this kind (including, without limitation, a weekly Borrowing Base reporting cycle; provided that inventory and fixed asset values shall only be updated monthly), and consistent with the financial reporting contained in the Existing Credit Agreement (as modified to take account of current financial condition of the Debtors and the commencement of the bankruptcy cases, including, without limitation, access to information and analysis concerning key customers and suppliers and to discussions with such customers and suppliers).

Right to Provide Additional DIP Financing:

In the event that the Company seeks to enter into any additional debtor in possession financing beyond the DIP Facility described herein, the DIP Lenders shall have the right to provide such additional debtor in possession financing on terms substantially similar to the best offer for such financing received by the Debtors.

Events of Default:

Substantially consistent with Prepetition Facility and the Restructuring and Plan Support Agreement (as modified or supplemented to reflect the commencement of the Chapter 11 Cases or otherwise in a manner customary for debtor-in-possession credit facilities).

Waivers and Amendments:

Amendments and waivers will require the approval of DIP Lenders holding more than 50% of total commitments or exposure under the DIP Facility (the "Required Lenders"), except that with respect to matters relating to the interest rates, maturity, amortization, certain collateral issues and the definition of Required Lenders, consent of

8

each DIP Lender directly and adversely affected thereby shall be required.

Adequate Protection:  As adequate protection for any diminution in the value of their collateral resulting from, among other things, the imposition of the automatic stay, the Borrower's use of cash collateral, the priming liens in favor of the DIP Facility, or otherwise, the Debtors shall (a) grant to the Priority Lenders (as defined in the Prepetition Facility) replacement liens on all of the Collateral, subordinate only to the liens in favor of the DIP Facility, the Carve-Out and permitted encumbrances, which shall be perfected by order of a court or courts of competent jurisdiction under section 363(e) and 364(d) of the Bankruptcy Code, (b) timely pay the reasonable fees and expenses of the professionals retained by the Existing Agents (including counsel and financial advisors in accordance with the engagement letters previously approved by the Borrower), (c) grant to the Priority Lenders a superpriority claim as provided for in section 507(b) of the Bankruptcy Code with priority in payment over any and all administrative expenses of the kinds specified or ordered under any provision of the Bankruptcy Code except for the DIP Administrative Claim and (d) pay to the Priority Lenders 100% of any Disposal Proceeds (as defined in the Prepetition Facility) that result from any sale of the business or of the assets of the Debtors and that remain after payment of the DIP Loans and any other amounts due in connection therewith. In addition, the Priority Lenders shall receive adequate protection payments for cost reimbursement, and interest shall be allowed to accrue pre-petition at the default rate and post-petition at the default rate, the receipt of such interest payments not to be recharacterized as payment of principal. Furthermore, the Priority Lenders shall receive as adequate protection financial reports and access to information and analysis concerning the Debtors' businesses that are reasonable and customary in light of the current financial condition of the Debtors and the commencement of the bankruptcy cases.

Borrower's and the Guarantor's cash, including all cash and other amounts on deposit or maintained in any account that is Collateral and any proceeds of the Collateral will be "cash collateral" of the Priority Lenders within the meaning of section 363(a) of the Bankruptcy Code.

No proceeds from the DIP Facility nor any of the Existing Lenders' cash collateral may be used to challenge the validity, perfection, priority, extent, enforceability or enforcement of the claims under the Prepetition Facility, or the liens or security interests securing the obligations under the Prepetition Facility; provided however, that an amount not in excess of an amount TBD will be available for payment of fees and expenses of professionals of any Committee incurred investigating the Existing Agent's and Existing Lenders' claims under the Prepetition Facility.

Conditions to Closing:  Delivery of an expert opinion on the Restructuring of Global Safety Textiles GmbH, Global Safety Textiles Acquisition GmbH, GST

9

Widefabric International GmbH, ITG Automotive Safety Poland Sp.z.oo, ITG Automotive Safety RO S.R.L. and ITG Automotive Safety Czech s.r.o. (collectively the "Restructuring Report Obligors") qualifying as a restructuring report (*Sanierungsgutachten*), prepared substantially in line with the requirement set by the German Institut der Wirtschaftspruefer (IDW) in its draft standard IDW ES 6 dated August 1, 2008 (as amended, modified or supplemented from time to time) and with a finding by the relevant expert that, based on the restructuring plan and the presumption of its proper implementation, (a) the Restructuring Report Obligors can be restructured and (b) a positive going concern prognosis can be assumed.

Delivery of a 3-year business plan with description of assumptions underlying the business plan, which business plan shall be in form and subject matter but not in substance satisfactory to the DIP Lenders in their sole discretion.

Delivery of a report detailing tax implications of the Restructuring, which report shall be in form and subject matter but not in substance satisfactory to the DIP Lenders in their sole discretion.

Delivery of a report detailing all variances between the 12-week cash flow forecasts delivered to the Existing Lenders, dated February 18, 2009 and updated on March 6, 2009 and fortnightly thereafter, and actual results, which report shall be in form and subject matter but not in substance satisfactory to the DIP Lenders in their sole discretion.

Delivery of a report detailing all professional fees incurred since January 1, 2009 in connection with the Restructuring, which report shall be in form and subject matter but not in substance satisfactory to the DIP Lenders in their sole discretion.

Delivery of customary "know your customer" documents, which documents shall be satisfactory to the DIP Lenders in their sole discretion.

Governing Law:                          New York.

Counsel to Administrative Agent         Latham & Watkins LLP.
and Arranger:

10

August 20, 2009

Global Safety Textiles Holdings LLC
Global Safety Textiles Acquisition GmbH
804 Green Valley Road
Suite 300
Greensboro, NC 27408
Attention: Mr. Georg Saint-Denis
            Mr. Frank Goehring

Ladies and Gentlemen:

We refer you to the commitment letter dated July 21, 2009 (the **"Commitment Letter"**) from the lenders party thereto (the **"DIP Lenders"**) to Global Safety Textiles Holdings LLC[1] and Global Safety Textiles Acquisition GmbH (the **"Borrowers"**). Terms defined in the Commitment Letter are used herein as defined therein.

We further refer you to the expiry of the commitment in that Commitment Letter whereby the DIP Lenders' commitments shall terminate upon the first to occur of (i) the Commitment Expiration Date (which date is defined in the Commitment Letter as August 31, 2009), (ii) the date that any insolvency proceedings are filed by any of the Debtors' non-debtor subsidiaries in respect of their own assets (other than chapter 11 cases jointly administered with the Bankruptcy Cases), (iii) the date that any insolvency proceedings are filed in respect of the Debtors' non-debtor subsidiaries by any party other than such Debtors non-debtor subsidiaries, unless such filing is dismissed within 10 business days, (iv) the date that the Debtors file any motion to approve of a sale of substantially all of their assets (including without limitation a motion to approve bidding procedures in connection with such a sale) in the Bankruptcy Cases, (v) the date of termination of the Restructuring and Plan Support Agreement to which the Commitment Letter is attached and (vi) August 31, 2009 if the Bankruptcy Court has not entered the Interim Order.

The DIP Lenders hereby agree that, subject to the terms and conditions hereof, the definition of "Commitment Expiration Date" in the Commitment Letter as August 31, 2009 shall be replaced and substituted with September 15, 2009 and the reference in the Commitment Letter to entry of the Interim Order by August 31, 2009 as set forth in clause (vi) of the immediately preceding paragraph of this letter shall be replaced and substituted with reference to entry of the Final Order by September 15, 2009 and such clause in the Commitment Letter shall be renumbered as

---

[1]     As provided in the Commitment Letter, additional borrowers may be included, and in the event Global Safety Textiles Holdings LLC does not join as a party to the Restructuring and Plan Support Agreement, will be substituted, subject to completion of financial, legal, tax and business due diligence.

clause (vi) (such changes being referred to herein collectively as the "**Commitment Extension**"), it being agreed and accepted by the Borrowers that such Commitment Extension is subject to and conditioned upon the all other terms and conditions of the Commitment Letter.

This letter may be executed in any number of counterparts, each of which when executed shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this letter by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

Please confirm that the foregoing is in accordance with your understanding by signing and returning to the DIP Lenders the enclosed copy of this letter, whereupon the extension of the commitment period under the Commitment Letter shall become binding among the parties hereto.

Very truly yours,

Name of Institution:     Highland Credit Opportunities CDO Ltd
                           By: Highland Capital Management, LP,
                           As Collateral Manager
                           By: Strand Advisors, Inc.,
                           its General Partner

Name of Authorized Signatory:
          JASON POST
      OPERATIONS DIRECTOR

Date:
08 | 17 | 2009

3

Very truly yours,

Name of Institution:

GE Leveraged Loans Limited

Name of Authorized Signatory:

GALINA MARKOVA
AUTHORISED SIGNATORY

Date:

18 August 2009

Nicole Gates
Managing Director

3

Very truly yours,

Name of Institution:

IKB Deutsche Industriebank AG, London Branch

Name of Authorized Signatory:
**Stuart Geddis**
**Senior Manager**

Martin Wright
Director

Date:

3

Very truly yours,

_____

Name of Institution:

LANDESBANK BADEN-WÜRTTEMBERG

Name of Authorized Signatory:

_____

Date:

18/08/2009

RAPHAEL WENGER

3

Very truly yours,

_____

Name of Institution:

**Sankaty Credit Opportunities II, L.P.**

_____

Name of Authorized Signatory:

Alan K. Halfenger
Chief Compliance Officer
Assistant Secretary

Date:

_____

3

Very truly yours,

---------------------------------

Name of Institution:

**Sankaty Credit Opportunities III, L.P.**

Name of Authorized Signatory:

Alan K. Halfenger
Chief Compliance Officer
Assistant Secretary

---------------------------------

Date:

---------------------------------

3

Very truly yours,

_____

Name of Institution:

**Sankaty Credit Opportunities IV, L.P.**

_____
Name of Authorized Signatory:

Alan K. Halfanger
Chief Compliance Officer
Assistant Secretary

Date:

_____

3

Very truly yours,

_____

Name of Institution:

**Sankaty Credit Opportunities (Offshore Master) IV, L.P.**

_____

Name of Authorized Signatory:

Alan K. Halfenger
Chief Compliance Officer
Assistant Secretary

Date:

_____

3

**ACCEPTED AS OF THE DATE ABOVE:**

GLOBAL SAFETY TEXTILES HOLDINGS LLC

By: _____

Date: _____

GLOBAL SAFETY TEXTILES ACQUISITION
GMBH

By: Anthony J. Forman, Managing Director

Date: August 20, 2009

4